OSCN Found Document:OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE v. DRUMMOND

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE v. DRUMMOND
2023 OK 24
526 P.3d 1123
Case Number: 120543
Decided: 03/21/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 24, 526 P.3d 1123

 
 

OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE, on behalf of itself and its members; TULSA WOMEN'S REPRODUCTIVE CLINIC, LLC, on behalf of itself, its physicians, its staff, and its patients; ALAN BRAID, M.D., on behalf of himself and his patients; COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, INC., on behalf of itself, its physicians, its staff, and its patients; and PLANNED PARENTHOOD OF ARKANSAS & EASTERN OKLAHOMA, on behalf of itself, its physicians, its staff, and its patients, Petitioners,
v.
GENTNER DRUMMOND, in his official capacity as Attorney General for the State of Oklahoma; VICKI BEHENNA, in her official capacity as District Attorney for Oklahoma County; STEVE KUNZWEILER, in his official capacity as District Attorney for Tulsa County; LYLE KELSEY, in his official capacity as Executive Director of the Oklahoma State Board of Medical Licensure and Supervision; BRET S. LANGERMAN, in his official capacity as President of the Oklahoma State Board of Osteopathic Examiners; KEITH REED, in his official capacity as the Commissioner of the Oklahoma State Board of Health, Respondents.

APPLICATION TO ASSUME ORIGINAL JURISDICTION 
FOR DECLARATORY AND INJUNCTIVE RELIEF AND/OR A WRIT OF 
PROHIBITION

¶0 The Petitioners filed an application to assume original jurisdiction seeking declaratory relief and to enjoin enforcement of two laws which criminalize abortion. They assert the laws are unconstitutional and the Oklahoma Constitution protects a woman's right to terminate a pregnancy. We hold there is a limited right to terminate a pregnancy that is protected by the Oklahoma Constitution. We assume original jurisdiction, grant declaratory relief in part and deny injunctive relief and writ of prohibition.

ORIGINAL JURISDICTION ASSUMED; DECLARATORY RELIEF 
GRANTED IN PART; INJUNCTIVE RELIEF AND WRIT OF 
PROHIBITION DENIED

Kelley Bodell, Barnum & Clinton, Norman, Oklahoma for Petitioners

Linda Cecilia Goldstein, Meghan Ann Agostinelli, Dechert LLP, New York, New York for Petitioners Oklahoma Call for Reproductive Justice, Tulsa Women's Reproductive Clinic, LLC, and Alan Braid, M.D.

Jerome A. Hoffman and Rachel Maura Rosenberg, Dechert LLP, Philadelphia, Pennsylvania for Petitioners Oklahoma Call for Reproductive Justice, Tulsa Women's Reproductive Clinic, LLC, and Alan Braid, M.D.

Jonathan S. Tam, Dechert LLP, San Francisco, California for Petitioners Oklahoma Call for Reproductive Justice, Tulsa Women's Reproductive Clinic, LLC, and Alan Braid, M.D.

Rabbia Claire Muqaddam, Center for Reproductive Rights, New York, New York for Petitioners Oklahoma Call for Reproductive Justice, Tulsa Women's Reproductive Clinic, LLC, and Alan Braid, M.D.

Diana Olga Salgado, Planned Parenthood Federation of America, Washington, D.C. for Petitioners Comprehensive Health of Planned Parenthood Great Plains, Inc. and Planned Parenthood of Arkansas & Eastern Oklahoma

Camila Vega, Planned Parenthood Federation of America, New York, New York for Petitioners Comprehensive Health of Planned Parenthood Great Plains, Inc. and Planned Parenthood of Arkansas & Eastern Oklahoma

Zach West, Solicitor General, and Audrey A. Weaver, Assistant Solicitor General, Office of Attorney General, State of Oklahoma, Oklahoma City, Oklahoma for Respondents

PER CURIAM:

¶1 The Petitioners consist of healthcare providers, Tulsa Women's Reproductive Clinic, LLC, Alan Braid, M.D., Comprehensive Health of Planned Parenthood Great Plains, Inc., Planned Parenthood of Arkansas & Eastern Oklahoma and an advocacy group, the Oklahoma Call for Reproductive Justice. The Respondents consist of the Attorney General of the State of Oklahoma, the district attorneys of Oklahoma and Tulsa counties, and the heads of various Oklahoma medical agencies.[1] The Petitioners filed this original proceeding asking this Court to assume original jurisdiction and grant declaratory relief concerning the constitutionality of two statutes, 21 O.S. 2021, § 861[2] and 63 O.S. Supp. 2022, § 1-731.4[3], which criminalize performance of certain abortions. They request this Court either issue an injunction preventing the enforcement of these statutes or, alternatively, issue a writ of prohibition preventing the Respondents from enforcing these statutes. The Petitioners allege the two statutes violate inherent rights and substantive due process rights guaranteed by sections 2[4] and 7[5] of article II of the Oklahoma Constitution. The gravamen of their argument is, following the recent decision of the United States Supreme Court in Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022), wherein the Court held there was no constitutional right to an abortion in the United States Constitution, that the Oklahoma Constitution provides an independent right to terminate a pregnancy and that right is unaffected by the Dobbs opinion. In addition, the Petitioners allege the statutes are unconstitutionally vague and that § 861 was repealed by implication by § 1-731.4.

¶2 This Court has discretion in determining whether to assume jurisdiction over a controversy in which both this Court and the district courts have concurrent jurisdiction. Edmondson v. Pearce, 2004 OK 23, ¶10, 91 P.3d 605, 613. Two themes run through most cases where original jurisdiction has been assumed: 1) the matter concerns the public interest, i.e., the case is publici juris in nature; and 2) there must be some urgency or pressing need for an early decision. Id. ¶11, 91 P.3d at 613. Here there is no question whether the matter is publici juris in nature, dealing as it does with laws that affect the right of a woman to terminate a pregnancy. We also believe there is a pressing need to rule on this matter as soon as possible due to the many challenges to laws which affect abortion following the recent Dobbs opinion and their effects on the people of this state. The Oklahoma Constitution gives the Supreme Court the authority to determine jurisdiction and such determination is final. Okla. Const. art. 7, § 4.[6] Original jurisdiction is assumed.[7]

I. ANALYSIS

A. The Oklahoma Constitution protects a limited right to an abortion

¶3 The Petitioners claim the two statutes, which outlaw most abortions, restrict a woman's right to have control over her own body and to make decisions concerning reproduction in violation of the Oklahoma Constitution. Therefore, we must first determine whether the Oklahoma Constitution provides a right, or at least some right, to terminate a pregnancy and if so what is the appropriate standard for determining when a state regulation violates that right.

¶4 The Petitioners assert a woman's right to terminate a pregnancy is protected by article II, section 7 of the Oklahoma Constitution (the state due process section), and article II, section 2 of the Oklahoma Constitution (inherent rights). Article II, section 7 of the Oklahoma Constitution provides:

No person shall be deprived of life, liberty, or property, without due process of law.

Until recently, the U.S. Constitution's Due Process Clause of the Fourteenth Amendment had been the basis for a national right to terminate a woman's pregnancy before viability of the fetus.[8] A woman's federal constitutional right to terminate her pregnancy was found to exist by the U.S. Supreme Court in 1973. In Roe v. Wade, 410 U.S. 113, 153 (1973) the Court held that a right of privacy founded in the Fourteenth Amendment's concept of personal liberty was broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The Court further determined that a right of personal privacy, which included the termination decision, was not unqualified and that it must be considered against important state interests in regulation. Id. at 154. It held that where certain fundamental rights are involved, regulations limiting such rights are only justified by a compelling state interest which must be narrowly drawn to express only the legitimate state interests at stake. Id. at 154-55. It held the compelling point for the state corresponded with the viability of the fetus. Id. at 163.

¶5 Nineteen years later, the U.S. Supreme Court revised its decision in Roe. In Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 860, 878 (1992), the Court retained the central holding in Roe, i.e., "that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions." Id. at 860. However, it found that Roe's prohibition of state abortion regulation in the first trimester was unwarranted. Id. at 875-76. It created an "undue burden" standard to determine whether a state regulation placed an unconstitutional burden on a woman's right to terminate a pregnancy prior to the viability of the fetus. The Court defined the undue burden test several ways in the opinion but it can best be summarized as "a statute which, while furthering the interest in potential life or some other valid state interest" is "invalid" and creates an "undue burden" if "its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Id. 876-78. It held that such "undue burden" was an "unconstitutional burden." Id. at 877. The Court found that a state may enact regulations, as it can with any other medical procedure, to further the health or safety of a woman seeking an abortion. Id. at 878. However, "unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion [pre-viability] impose an undue burden on the right." Id. at 878. The Court then reaffirmed Roe's holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id. at 879 (quoting Roe at 164-65) (emphasis added).

¶6 On June 24, 2022, the U.S. Supreme Court overruled Roe and Casey. Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2284 (2022). After forty-nine years of respecting a woman's right to terminate a pregnancy under the federal Due Process Clause, the U.S. Supreme Court held the federal Constitution does not grant that right. The Court found that in order for a fundamental right to be recognized as a component of the liberty protected in the Due Process Clause such right must be deeply rooted in our Nation's history and tradition. Id. at 2246, 2260. It determined that was not the case based upon the fact that prior to the Roe decision "abortion had long been a crime in every single State." Id. at 2248. The Court explained, there was no "fundamental constitutional right to an abortion because such right had no basis in the Constitution's text or in our Nation's history." Dobbs, at 2283. Therefore, it determined the appropriate standard of review is a rational-basis review when state abortion regulations undergo federal constitutional challenges. Id. It held "[t]he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. Roe and Casey abrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives." Id. at 2284. Dobbs took the issue of abortion out of the U.S. Constitution and placed it squarely with the states.

¶7 Since Roe, this Court has followed the U.S. Supreme Court's interpretation of the federal Due Process Clause when deciding issues related to abortion. It was unnecessary for this Court to determine whether there existed an independent right to terminate a pregnancy under the Oklahoma Constitution. Although we have refrained from finding a right to terminate a pregnancy in the Oklahoma Constitution, we have never ruled such right did not exist. See Oklahoma Coalition for Reproductive Justice v. Cline, 2019 OK 33, ¶17, 441 P.3d at 1151. If we adopted the Dobbs analysis we would have to find a right to terminate a pregnancy was deeply rooted in Oklahoma's history and tradition. Dobbs relied upon various state statutes that criminalized abortion to help determine whether abortion rights were deeply rooted in this nation. Even during the Oklahoma Territory there were laws outlawing certain terminations of pregnancy. See Okla. (Terr.) Stat. §§ 2187, 2188 (1890). Soon after statehood and the adoption of the Oklahoma Constitution these laws persisted and were recodified several times. For many years these laws have been codified in Sections 861 and 862 of title 21 of the Oklahoma Statutes. Section 862 has since been repealed but § 861 still exists. See 2021 Okla. Sess. Laws ch. 308, § 1, S.B. 918. Section 861 provides:

Every person who administers to any woman, or who prescribes for any woman, or advises or procures any woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life shall be guilty of a felony punishable by imprisonment in the State Penitentiary for not less than two (2) years nor more than five (5) years. (emphasis added).

This law has changed very little since the days of the Oklahoma Territory. In 1973, the Court of Criminal Appeals of Oklahoma declared that because of the decision in Roe both sections are "unconstitutional as being violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Jobe v. State, 1973 OK CR 51, ¶4, 509 P.2d 481, 482. However, enforcement of § 861 was revived by law when Dobbs overruled Roe and Casey. See 2021 Okla. Sess. Laws ch. 308, § 18, S.B. 918, as amended by, 2022 Okla. Sess. Laws ch. 133, § 1, S.B. 1555.

¶8 In its finding that the various state laws did not support a history or tradition of a national right to an abortion, Dobbs focused on the criminal element of such statutes. However, that is only half the story in Oklahoma. As much as § 861 had always outlawed abortion it also always acknowledged a limited exception. The law in Oklahoma has long recognized a woman's right to obtain an abortion in order to preserve her life ("unless the same is necessary to preserve her life"). Our history and tradition have therefore recognized a right to an abortion when it was necessary to preserve the life of the pregnant woman. This right can be viewed as protected by the Oklahoma due process section. It can also be viewed as a right protected under the inherent rights provided in article II, section 2 of the Oklahoma Constitution. This section provides:

All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry.[9]

It creates an "inherent right to life" as well as "liberty" and stands as the basis for protecting a pregnant woman's right to terminate a pregnancy in order to preserve her life.

¶9 We hold that the Oklahoma Constitution creates an inherent right of a pregnant woman to terminate a pregnancy when necessary to preserve her life. We would define this inherent right to mean: a woman has an inherent right to choose to terminate her pregnancy if at any point in the pregnancy, the woman's physician has determined to a reasonable degree of medical certainty or probability that the continuation of the pregnancy will endanger the woman's life due to the pregnancy itself or due to a medical condition that the woman is either currently suffering from or likely to suffer from during the pregnancy. Absolute certainty is not required, however, mere possibility or speculation is insufficient.

¶10 We make no ruling on whether the Oklahoma Constitution provides a right to an elective termination of a pregnancy, i.e., one made outside of preserving the life of the pregnant woman as we have defined herein.

¶11 We must also determine what standard should be applied when reviewing challenges to state laws affecting the inherent right to preserve the life of the pregnant woman. Dobbs held there was no right to an abortion under the federal Constitution and therefore the applicable standard to apply would be the highly deferential rational-basis test when state abortion laws were challenged under federal law. Here, we are concerned with an inherent right to terminate a pregnancy to preserve the woman's life which is protected under the Oklahoma Constitution. Regulations that significantly impair an inherent right must survive strict scrutiny. See State ex rel. Oklahoma Bar Ass'n v. Porter, 1988 OK 114, ¶¶24-25, 766 P.2d 958, 967-68. The state may prevail only upon showing its subordinating interest is compelling and such interest must be narrowly tailored to avoid unnecessary abridgement of the right. Id. ¶24, 766 P.2d at 967-68. In Porter we held:

A mere showing of state interest is insufficient; the interest must be paramount, of vital importance, and the burden is on the government to show its existence. Further it is not enough to show a rational relationship between the means chosen and the end sought to be accomplished. The advance of the subordinating interest must outweigh the loss of protected rights and the government must employ means closely drawn to avoid unnecessary abridgement. If the state has open to it a less drastic method of satisfying its legitimate interest it may not validly choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.

Id. ¶25, 766 P.2d at 968.

B. The Constitutionality of the Two Statutes

¶12 Both § 861 and § 1-731.4 are statutes which criminalize the performance of certain abortions. As mentioned, § 861 provides a narrow exception if it is necessary to "preserve" the life of the woman. However, the scheme in § 1-731.4 is much more invasive to a woman's right to terminate a pregnancy in order to preserve her life. Section 1-731.4 (A) (2) first defines a "medical emergency" as:

[A] condition which cannot be remedied by delivery of the child in which an abortion is necessary to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness or physical injury including a life-endangering physical condition caused by or arising from the pregnancy itself.

Next, it provides in paragraph (B)(1):

Notwithstanding any other provision of law, a person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency.

The language, "except to save the life of a pregnant woman in a medical emergency" is much different from "preserve her life" found in § 861. It restricts the performance of an abortion to only a pregnant woman who is "in a medical emergency" which includes that her life "is endangered." We read this section of law to require a woman to be in actual and present danger in order for her to obtain a medically necessary abortion. We know of no other law that requires one to wait until there is an actual medical emergency in order to receive treatment when the harmful condition is known or probable to occur in the future. Requiring one to wait until there is a medical emergency would further endanger the life of the pregnant woman and does not serve a compelling state interest. We hold this section of law, 63 O.S. Supp. 2022, 1-731.4, cannot meet the test of strict scrutiny and is therefore void and unenforceable. Having found the statute to be void and unenforceable, there is no need to address Petitioners' other constitutional challenge, i.e., the statute is unconstitutionally vague.

¶13 The Petitioners also allege § 861: 1) violates rights protected under the Oklahoma Constitution; 2) is unconstitutionally vague, due to conflicts with its language and other enacted statutes, including § 1-731.4; and 3) was repealed by implication. For the above mentioned reasons, we do not find § 861 violates the Oklahoma Constitution as it allows the termination of a pregnancy in order to preserve the life of the pregnant woman. Again, we make no ruling on whether an elective abortion is constitutional. Nor do we find the language in § 861 itself is unconstitutionally vague. This opinion clarifies what it means to preserve the life of the pregnant woman. The Oklahoma Court of Criminal Appeals has addressed what constitutes unconstitutional vagueness:

Due process requires that a criminal statute give fair warning of the conduct which it prohibits. Specifically, the Supreme Court of the United States has held that: "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

Hughes v. State, 1994 OK CR 3, ¶20, 868 P.2d 730, 735 (quoting United States v. Harriss, 347 U.S. 612, 617 (1954)). The Petitioners' arguments largely rely on alleged conflicts between the language in § 861 and § 1-731.4 which they believe create unconstitutional vagueness in violation of due process. However, having determined § 1-731.4 to be void and unenforceable there is no potential conflict with § 861. Further, Petitioners allege § 861 is in conflict with two so-called civil "vigilante" enforcement Acts.[10] Neither Act is part of the challenge before us today. The two Acts are currently before this Court in another matter, Oklahoma Call for Reproductive Justice v. State of Oklahoma, Case No. 120, 376. We do not find that § 861 fails to unambiguously specify the activity proscribed and the penalties available upon conviction and therefore it is not unconstitutionally vague. See United States v. Batchelder, 442 U.S. 114, 123 (1979).

¶14 The Petitioners additionally assert that § 861 was repealed by implication by a later enacted law. Since Jobe, § 861 had been found to be unconstitutional only because of the United States Supreme Court decision in Roe. In 2021, S.B. 918 was enacted and consisted of many repealer sections. The Act had a conditional effective date that provided the entire Act would become effective when the Oklahoma Attorney General certifies that Roe and Casey had been overruled by the United States Supreme Court. The following year, S.B. 1555 (2022) amended the conditional effective date section of S.B. 918. It also repealed all but one of S.B. 918 repealer sections. The amended effective date now provides that section 1 of S.B. 918 would become effective when the attorney general certifies that Roe and Casey had been overruled by the Supreme Court "such that the State of Oklahoma may enforce Section 861 of Title 21 of the Oklahoma Statutes or enact a similar statute prohibiting abortion throughout pregnancy . . . ." On June 24, 2022, the attorney general made the required certification and stated "the State of Oklahoma may enforce Section 861 of Title 21 of the Oklahoma Statutes or enact a similar statute prohibiting abortion throughout pregnancy." The Petitioners assert that the conjunction "or" in S.B. 1555 meant that any other later enacted law to criminalize abortion, i.e., 63 O.S. Supp. 2022, § 1-731.4, would repeal § 861 by implication. Section 1-731.4 became effective in August of 2022 (S.B. 612, 2022 Okla. Sess. Laws ch. 11) and therefore was enacted after § 861. Repeals by implication are not favored and all statutory provisions must be given effect if possible. City of Sand Springs v. Dept. of Public Welfare, 1980 OK 36, ¶28, 608 P.2d 1139, 1151. Nothing short of irreconcilable conflict between statutes accomplishes a repeal by implication. Sesow v. Swearingen, 1976 OK 97, ¶4, 552 P.2d 705, 706. Where such a conflict exists, the later modifies the earlier, even where both sections were enacted into the same official codification. Ex parte Burns, 1949 OK CR 11, 202 P.2d 433. Where statutes conflict in part, the one last passed, which is the later declaration of the Legislature, should prevail, superseding and modifying the former statute only to the extent of such conflict. Consumers Co-op Ass'n. v. Titus, 1949 OK 86, ¶7, 205 P.2d 1162, 1163.

¶15 The legislative intent behind S.B. 1555's conditional effective date language is not clear. The use of the conjunction "or" could mean there is a choice as to whether to provide enforcement pursuant to § 861 or another later enacted statute. S.B. 612 which enacted § 1-731.4 makes no mention of § 861 nor does it contain any repealer sections or any type of conditional language. If the Legislature had intended to conditionally repeal § 861, it could have easily done so in that bill. A repeal by implication compares the language of two statutes to determine if there is an irreconcilable conflict. Here, however, we find § 1-731.4 to be void and unenforceable and therefore we do not find it poses a conflict or in any way repealed § 861 by implication.

II. CONCLUSION

¶16 We hold the Oklahoma Constitution under the provisions of article II sections 2 and 7 protects the right of a woman to terminate her pregnancy in order to preserve her life. Having determined the Oklahoma Constitution protects the right of a woman to terminate her pregnancy in order to preserve her life, we hold that 63 O.S. Supp. 2022, § 1-731.4 does not pass strict scrutiny review and is void and unenforceable. We hold, 21 O.S. 2021, § 861 does not violate this protection as it allows a woman to terminate her pregnancy, as defined herein, in order to preserve her life. Therefore we grant Petitioner declaratory relief as to 63 O.S. Supp. 2022, § 1-731.4 but deny declaratory relief as to 21 O.S. 2021, § 861. Having found § 1-731.4 is unconstitutional and therefore unenforceable, it is unnecessary to address the Petitioners' request for injunctive relief and/or writ of prohibition. Petitioners request for injunctive relief and/or a writ of prohibition is denied. See Hunsucker v. Fallin, 2017 OK 100, ¶37, 408 P.3d 599, 612.

ORIGINAL JURISDICTION ASSUMED; DECLARATORY RELIEF 
GRANTED IN PART; INJUNCTIVE RELIEF AND WRIT OF 
PROHIBITION DENIED

KAUGER (by separate writing), WINCHESTER, EDMONDSON, COMBS (by separate writing) and GURICH, JJ. - CONCUR

KANE, C.J. (by separate writing), ROWE, V.C.J. (by separate writing), DARBY (by separate writing) and KUEHN, JJ. (by separate writing) -- DISSENT 

FOOTNOTES

[1] The names of the Attorney General of Oklahoma, District Attorney of Oklahoma County and President of the Oklahoma State Board of Osteopathic Examiners have been updated to reflect the current persons serving in those positions. 12 O.S. 2021, § 2025 (D).

[2] 21 O.S. 2021, § 861:

Every person who administers to any woman, or who prescribes for any woman, or advises or procures any woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life shall be guilty of a felony punishable by imprisonment in the State Penitentiary for not less than two (2) years nor more than five (5) years.

[3] 63 O.S. Supp. 2022, § 1-731.4:

A. As used in this section:

1. The terms "abortion" and "unborn child" shall have the same meaning as provided by Section 1-730 of Title 63 of the Oklahoma Statutes; and

2. "Medical emergency" means a condition which cannot be remedied by delivery of the child in which an abortion is necessary to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness or physical injury including a life-endangering physical condition caused by or arising from the pregnancy itself.

B. 1. Notwithstanding any other provision of law, a person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency.

2. A person convicted of performing or attempting to perform an abortion shall be guilty of a felony punishable by a fine not to exceed One Hundred Thousand Dollars ($100,000.00), or by confinement in the custody of the Department of Corrections for a term not to exceed ten (10) years, or by such fine and imprisonment.

3. This section does not:

a. authorize the charging or conviction of a woman with any criminal offense in the death of her own unborn child, or

b. prohibit the sale, use, prescription or administration of a contraceptive measure, drug or chemical if the contraceptive measure, drug or chemical is administered before the time when a pregnancy could be determined through conventional medical testing and if the contraceptive measure, drug or chemical is sold, used, prescribed or administered in accordance with manufacturer instructions.

4. It is an affirmative defense to prosecution under this section if a licensed physician provides medical treatment to a pregnant woman which results in the accidental or unintentional injury or death to the unborn child.

[4] Okla. Const. art. 2, § 2:

All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry.

[5] Okla. Const. art. 2, § 7:

No person shall be deprived of life, liberty, or property, without due process of law.

[6] One dissent implies that there is concurrent jurisdiction between this Court and the Court of Criminal Appeals in deciding the constitutionality of the two criminal statutes at issue in this matter, arguing a potential conflict would arise if a later challenge is presented to the Court of Criminal Appeals. The Oklahoma Constitution makes abundantly clear that in any jurisdictional conflict, the Supreme Court's determination of jurisdiction is final. Okla. Const. art. 7, § 4.

[7] The Respondents admit that the Petitioners' have properly presented to this Court the question of whether there exists a right to an abortion under the Oklahoma Constitution. However, they challenge this Court's jurisdiction to address the Petitioners' arguments concerning unconstitutional vagueness of the two challenged criminal statutes and implied repeal of 21 O.S. § 861. They assert the interpretation of these issues is within the sole authority of the Oklahoma Court of Criminal Appeals (OCCA).

The Respondents rely upon our precedent wherein we have found deference to the decisions of the Oklahoma Court of Criminal Appeals in matters relating to its construction of criminal statutes and whether they violate the Oklahoma Constitution. In Ikard v. Russell, a relator was charged with nepotism under a statute that defined the term as well as provided criminal misdemeanor punishment and forfeit of office for a violation of the statute. 1912 OK 425, 124 P. 1092. The relator filed a writ of prohibition in this Court challenging the district court's jurisdiction based upon a previous decision of this Court. We denied the writ and noted since our previous decision the OCCA had handed down a decision on point which was contrary in its conclusion to our earlier opinion. We determined "[i]t is settled policy of the Supreme Court to follow the construction given to criminal statutes by the Criminal Court of Appeals, since the enforcement of such statutes must be in accordance with such construction." Id. ¶1, 124 P. at 1093. The wisdom behind this policy was to avoid a situation where the OCCA would adhere to its construction while this Court adhered to its previous construction, thus allowing an important class of criminal offenses to go unpunished. Id. ¶3, 124 P. at 1093.

In Ex parte Meek, 1933 OK 473,¶9, 25 P.2d 54, 55, this Court held:

This court is the supreme judicial court of the state of Oklahoma in all civil matters, passing by as not material to this discussion the relative rank of the state Senate when it is sitting as a court of impeachment. Our construction of legislation as being constitutional or otherwise judged by our own Constitution is supreme and final. It is possible that in the execution of the law complained of, or a similar law, i. e., one that is civil in its general purposes as distinguished from one that is criminal, but which might carry provisions making nonobservance or a violation of its provisions a crime and specifying the punishment therefor, that the construction of the portions thereof relating to the crime and its punishment by the Criminal Court of Appeals might differ from the construction of the law as generally construed by this court from a civil standpoint. But if we hold an act generally to be repugnant to our Constitution, such a construction would be paramount and the law of the state of Oklahoma, even though it might be in conflict with the construction of the Criminal Court of Appeals.

Here, the matter before us is not a criminal case. The challenges to vagueness and repeal by implication are specifically related to the two statutes challenged in this matter. The Respondents have cited no opinion of the OCCA deciding whether 21 O.S. § 861 or 63 O.S. § 1-731.4 are unconstitutionally vague or that 21 O.S. § 861 has been repealed by implication. Further, Respondents note that the Petitioners have properly raised in this Court the question of the constitutionality of these statutes concerning a right to an abortion. That issue addresses the constitutionality of 21 O.S. § 861 and 63 O.S. § 1-731.4. It is unclear how they would believe one constitutional challenge should be brought to this Court yet another challenge, on the same statutes, should be brought to the OCCA in the same controversy. If we were to agree, we would potentially end up with the very situation that we avoided in Russell.

[8] Our state due process section is nearly identical to the Due Process Clause found in the Fourteenth Amendment of the U.S. Constitution, which provides:

[N]or shall any State deprive any person of life, liberty, or property, without due process of law.

[9] The U.S. Constitution does not contain a section identical to art. 2, § 2, Okla. Const.

[10] The two Acts are H.B. 4327 (2022 Okla. Sess. Laws ch. 321) and S.B. 1503 (2022 Okla. Sess. Laws ch. 190), which both provide certain bans on abortion and each are exclusively enforced in a private civil action.

 

 

KAUGER, J., with whom Edmondson, J., and Combs, J., joins, concurring:

¶1 I fully concur in the majority opinion which finds 21 O.S. 2021 §861 constitutional. I write only to address the incongruity of 63 O.S. Supp. 2022 §1-731.4[1] The right to preserve the life of the mother is deeply rooted in Oklahoma law. In territorial days,[2] and statutorily at statehood, the law preserved this right.[3] Obviously, the framers of the Constitution took this into account when they unambiguously guaranteed the inherent rights of life, liberty, and the pursuit of happiness.[4] There was not an exception carved out of the statutes or the Constitution requiring a medical emergency.[5] The law provided that the right to terminate a pregnancy was available to preserve the life of the mother -- period.[6]

 

¶2 The Oklahoma Constitution begins with the Preamble:

Invoking the guidance of Almighty God, in order to secure and perpetuate the blessing of liberty; to secure just and rightful government; to promote our mutual welfare and happiness, we, the people of the State of Oklahoma, do ordain and establish this Constitution.

The Oklahoma Constitution ends with the Schedule. Section 1 of the Schedule expressly preserves existing rights. It provides:

No existing rights, actions, suits, proceedings, contracts, or claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place. And all processes which may have been issued previous to the admission of the State into the Union under the authority of the Territory of Oklahoma or under the authority of the laws in force in the Indian Territory shall be as valid as if issued in the name of the State.

Section 2 of the Schedule provides that:

All laws in force in the Territory of Oklahoma at the time of the admission of the State into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the State of Oklahoma until they expire by their own limitation or are altered or repealed by law.[7]

¶3 Schedule 2 safeguarded the right to terminate a pregnancy to preserve the life of the mother, the same as the right to have children is a basic, fundamental, unenumerated, civil right which is not explicit in the Constitution. For example, the Okla. Const. art 2, §26[8] grants the right to bear arms, but nowhere in the original Constitution is the right to marry or to bear children -- but they are inherent, basic, unenumerated, fundamental liberty rights.

¶4 The law allowing termination of a pregnancy to preserve the life of the mother was the same as before statehood and before and after the constitutional convention. Obviously, the Constitutional Convention did not find the right to terminate a pregnancy to preserve the life of the mother to be repugnant to the Constitution. The Constitution Schedule affirmed the right which existed pre-statehood. [9] It continued until the 3rd Legislature Session in which some members of the House and Senate who had been delegates to the Constitutional Convention reaffirmed it.

¶5 The right of termination existed even at times when the woman had no control over her own body. A married woman, in what is now the United States, from the time of its earliest settlement until well into the twentieth century, had little or no say about her body and her children, her property, where she lived, her civic duties, her opportunities, her career, her dress ---- indeed her life. The incongruity of the challenged statute is that from colonization until present times, a woman's right to control her life, liberty, and pursuit of happiness has grown exponentially.

¶6 Nevertheless, with the enactment of the challenged statute, despite great leaps in the advancements of personal autonomy, a woman in Oklahoma has been stripped of one right which existed in both territorial days and statehood ----- the right to terminate a pregnancy to preserve her life without exception. This is not compatible with the Oklahoma Constitution which provides greater rights than the United States Constitution.[10] The federal constitution is the floor, not the ceiling.[11] If the state's constitution provides greater rights, it prevails, and since Dobbs v. Jackson Women's Health Organization,142 S.Ct. 2228, 213 L.Ed.2d 545(2022) United States Supreme Court has deferred this question to the states to determine.[12]

I.

THE RIGHT OF TERMINATION TO PRESERVE HER LIFE EXISTED EVEN AT TIMES WHEN A WOMAN HAD LITTLE OR NO SAY ABOUT HER BODY. 

¶7 Women have had to deal with the threat of legally and socially condoned discrimination and physical violence visited against them for centuries. Despite the scriptural admonition that husbands love their wives as their own bodies, corporal discipline was permitted by law, and the emphasis was on submission of a wife to the husband.[13] The early laws of Rome made women subject to the power of their husbands, and gave husbands the power to execute their wives under socially condoned circumstances. A husband during this period could put his wife to death for drinking wine or committing adultery. [14] The King of England, Henry the VIII, beheaded two of his wives.

¶8 Corporal discipline against a wife by a husband existed from the earliest days of American colonization. Spousal abuse was even the subject of "humorous" cartoons. It is in this time that the common understanding that a husband could beat his wife with a stick no larger than his thumb apparently became entrenched in the minds of lawyers and jurists.[15] This "rule of thumb" lived on in the United States well into the nineteenth century.[16]

 

¶9 One exception to this practice was found with the English Puritans, who enacted the first laws anywhere in the world against wife-beating.[17] Nevertheless the Anglo-American common law originally provided that a husband, as master of his household, could subject his wife to corporal punishment or "chastisement" as long as he did not inflict permanent injury on her.[18] He could do this much in the same way he was allowed to correct his children.[19] His slaves were subject to even more severe discipline.[20] (History casts a long shadow. On February 2, 2023, the Fifth Circuit Court of Appeals, decided that a person under a domestic violence protective order had the right to continue to possess guns.)

¶10 Marriage did not take from the wife her general capacity to commit a crime, but it cast on her the duty of obedience to her husband. Except as to crimes named in the Penal Code, in the absence of proof to the contrary, the law presumed that when she committed the act, it was charged in the presence and with the assent of her husband, and was the result of restraint or coercion.[21]

¶11 Because the husband was the head of the household, and the person who directed its activity, the wife generally received immunity from prosecution for certain crimes.[22] Immunity was granted, with certain exceptions, because if a wife committed a crime in the presence of her husband, it was accepted that she must have been acting under coercion or in obedience to her husband because he was the head of household.[23]

¶12 Although many of these practices or notions were no longer sanctioned by statehood, it was 1973 before Oklahoma women finally gained the right to recover against a tortfeasor for loss of consortium -- a right previously reserved for men only.[24] From Oklahoma statehood until 1984, a husband could rape his wife because rape was defined as an act of sexual intercourse accomplished with a female, not the wife of the perpetrator."[25] In 1984, the following provision was added to the statute:

B. Rape is an act of sexual intercourse accomplished with a male or female who is the spouse of the perpetrator if force or violence is used or threatened, accompanied by apparent power of execution to the victim or to another person and if:

1. A petition for divorce is pending; or
2. A petition for legal separation is pending or has been granted; or
3. A petition for a protective order as provided . . .is pending; or
4. The victim and perpetrator are living separate and apart from each other.

The statute has been amended several times, but it wasn't until 1993, that the conditions of divorce, separation, etc. were removed.[26] A woman can no longer be beaten or legally raped by her husband.[27] Even with such advancements, and the enactment of the Violence Against Women Act,[28] 63 O.S. Supp. 2022 §1-731.4 removes the right a woman had to terminate a pregnancy to preserve her life without exception before and after statehood in Oklahoma.

II.

THE RIGHT OF TERMINATION TO PRESERVE HER LIFE EXISTED
EVEN AT TIMES WHEN A WOMAN HAD LITTLE OR NO SAY ABOUT
HER PROPERTY.

¶13 "The husband and wife are one person in law," the English legal theorist Sir William Blackstone explained in 1765; "that is, the very being or legal existence of the woman is suspended during the marriage."[29] A historian noted that the Tennessee legislature allegedly stated that "married women lack independent souls" and therefore should not be allowed to own property.[30]

¶14 Abigail Adams in a letter to John Adams on March 31, 1776, wrote. "I long to hear that you have declared an independency. . . I desire you would Remember the Ladies, and be more generous and favorable to them than your ancestors."[31] In 1782, she complained that married women's property was subject to the control and disposal of their husbands.

¶15 Under the law, husbands assumed complete authority over their wives' real estate (land and buildings). If a married woman brought personal property (which consisted of everything except real estate or property subsequently acquired, be it cash or cattle), it, along with the income generated by her real estate, went to her husband, to dispose of as he pleased. Spinsters and widows could execute wills disposing of their belongings. Married women lacked the ability to do so. They were not permitted to distribute their real estate and there was no legal mechanism for them to express their wishes regarding their personal property; because they had none to give.[32]

¶16 It wasn't until the middle of the eighteenth century that married women began to gain some level of autonomy over their property. By the end of the Civil War, Married Women's Property Acts granting women rights to own and control property had been enacted in twenty-nine states.[33] However, the right to own property did not provide wives parity with their husband in the decisions relating to the household/family. If they were not the head of the household, Oklahoma women could not hold a homestead until 1905.[34] It wasn't until 1988, that Representative Freddie Williams managed to change the statute that prevented married women from deciding where or how they were to live because her husband made the decision as head of the family. Title 32 O.S.1981 §2, provided:

The husband is the head of the family. He may choose any reasonable place or mode of living and the wife must conform thereto.

Some women coped by utilizing the old adage which was memorialized in My Big Fat Greek Wedding: "The man may be the head of the household, but the woman is the neck, and she can turn the head whichever way she pleases." This statute was repealed in 1988.

¶17 Until 1974, most banks refused to issue a credit card to an unmarried woman, and if a woman were married, her husband was required to cosign.[35] Equal pay for equal work is an area where progress has been slow. Employment of women has always been problematic. During World War II, the Rosie Riveters necessarily began doing men's jobs because men were at war. After the war ended, the women were replaced by returning veterans who needed the jobs.[36]

¶18 From 1960 to 2007, women made from 56.6% to 77% of a men's wages.[37] The Equal Pay Act of 1963 prohibited sex-based wage discrimination in the same establishment for jobs that require substantially equal skill, effort, and responsibility under similar working conditions. (Oklahoma was one of fifteen states that failed to pass the proposed Equal Rights Amendment.) Despite the Equal Pay Act, and the 2009 Lilly Ledbetter Act, women have not reached parity.[38] In 2021, the average woman who was employed full-time, was paid an average of 82% of the typical man's pay. The teaching profession has always been dominated by women. Nevertheless, according to a recent Brookings Institute brief, men are paid up to $4000.00 annually more than women.[39] Historically, an Oklahoma woman, whether married or single, -- even if she were not allowed to decide where or how to live, or to make decisions about her family, or to own a credit card, or to earn equal pay could terminate a pregnancy to preserve her life without exception -- until now.

III.

THE RIGHT TO TERMINATE TO PRESERVE HER LIFE EXISTED
EVEN AT TIMES WHEN A WOMAN HAD LITTLE OR NO SAY ABOUT
HER ABILITY TO VOTE, HER CIVIC PARTICIPATION, OR HER 
CAREER.

¶19 The woman's suffrage movement began in the United States in 1848.[40] Despite protests, marches, imprisonment, hunger strikes, and force feedings of suffragettes, when the Oklahoma Constitution was ratified in 1907, women were still not allowed to vote, except in school board elections.[41] They could not vote because they were not qualified electors -- a status reserved only to males.[42] Title R.L. 1910 §2943 provided: "Words used in the masculine gender include the feminine and neuter."[43] This statute has not been amended. However, in the 2023 legislative session, a bill has advanced to define "female." Women were prevented from serving as jurors because it was determined that although the use of the word "men" was inclusive of women, but the use of the word "male" did not include female. The statute defining qualified electors used "male."[44]

¶20 Obviously, women could not serve on juries because they could not qualify as electors. The qualifications pursuant to Oklahoma Statute, 1910, §3698 for jury duty were even more stringent.[45] It excluded habitual drunkards, those affected by disabilities, and lacking good moral character from service. The combined disqualifications of 1910, Art. 5, §3118 and Oklahoma statutes 1910 §368 meant that a woman had the same disqualifying characteristics as a prisoner, a poorhouse or asylum dweller, a drunk, idiot, incompetent felon, and those lacking good moral character.

¶21 Sir William Blackstone, making sure the "defect of sex" disqualification was written into law, was alleged to have asserted that women were too emotional, dumb, or irrational to be trusted with jury duty. In this country, supporters of the exclusion of women from juries based their objections as a need to protect women from the ugliness and depravity of trials; women were just too fragile and virginal to withstand the polluted courtroom atmosphere.[46]

¶22 Wyoming was the first state to allow women to serve as grand jurors in 1870.[47] It was 81 years later before Oklahoma, in 1951, allowed women to serve on grand and petit juries.[48] (However, 22 O.S. 2011 §311 still refers to grand jurors as men.[49])

¶23 When the Oklahoma Constitution was ratified in 1907, women were allowed to be notaries and county school superintendents, but justices, district judges, or court clerks had to be qualified voters;[50] of course, at the time, women were not. In 1912, the Oklahoma Supreme Court determined women could hold the office of county clerk.[51]

¶24 In 1923, Oklahoma voters passed a state question designed to amend art. 6 §3 of the Oklahoma Constitution. It provided that women could hold any state office. The amendment passed by an 86,000 vote margin. But a lawsuit was filed, and in 1930, the Oklahoma Supreme Court held that the amendment was void because the question had been wrongfully held in a special election when it should have been submitted in a general election.[52] Even if it had been determined to be valid, it contained the proviso that a person could not serve unless they had been a qualified elector for ten years preceding the election or appointment, thus precluding service at the time it passed. Women could not qualify because suffrage was granted in Oklahoma in 1919 and ten years would not have passed by 1923. It was 1942 before organized efforts were successful in getting the question finally passed, making women eligible for the top state offices.[53]

¶25 Qualified women struggled against professional barriers and were often denied the privilege of practicing law.[54] The Illinois Supreme Court denied Myra Bradwell's application on the basis that married women could not make contracts, which was a necessity for any lawyer. They denied her application a second time on February 5, 1870, with Chief Justice Charles B. Lawrence pontificating "God designed the sexes to occupy spheres of action and it belonged to men to make, apply and execute the laws as an almost axiomatic truth."[55]

¶26 Justice Joseph Bradley, in his concurring opinion in Bradwell v. The State, 83 U.S. 130 (1873), wrote that there was no historical precedent for women to engage in any and every occupation, profession, or employment. "The civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, a woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life."

¶27 Minerva K. Elliott Lentz passed and was admitted to the Oklahoma Territory bar in 1893.[56] As of 2021, women have gone from being denied admission to the bar to becoming 55.29% of all students in ABA approved law schools.[57] In 1982, seventy-five years after statehood, Alma Bell Wilson was appointed by Governor George Nigh as the first woman on the Oklahoma Supreme Court.[58] In January of 1995, Mary Fallin became the first woman to serve as lieutenant governor of Oklahoma. In 2011, two women ran for Governor. After defeating Jari Askins, a former judge, legislator, and presently the first woman Administrative Director of the Oklahoma Courts, Fallin became the first woman in over one hundred years after statehood to serve as governor of Oklahoma.[59] A woman has not served as Speaker of the Oklahoma House of Representatives, or as President Pro Tempore of the Senate. Nor has a woman done so in the United States Senate.

¶28 The exclusion of women from membership in all-male clubs was declared unconstitutional in New York State Club Association Inc. v. City of New York, 487 U.S. 1 (1988); and the 1987 ruling, Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987), gave women access to the inner circle of business and professional leaders. It allowed women to have luncheon meetings with their town's movers and shakers. With this opening, women were exposed to business opportunities and gained the ability to be on equal footing with their male colleagues to network and make potential contacts.

¶29 For the most part, women are no longer considered to have the same disqualifications as prisoners, asylum dwellers, drunks, idiots, incompetents, felons, and sufferers from defects of sex; or too dumb, emotional, or irrational to be trusted with voting, jury duty, civic participation, or the practice of law.[60] Nevertheless, women in Oklahoma before and after statehood had the right to terminate a pregnancy to preserve her life without the determination that a medical emergency existed.

IV.

THE RIGHT TO TERMINATION TO PRESERVE HER LIFE EXISTED
EVEN AT TIMES WHEN A WOMAN HAD LITTLE OR NO SAY ABOUT 
HER DRESS. 

¶30 In the 1600's in New Jersey, the law provided that women would be subjected to the same treatment as witches if they lured men into marriage with the wearing of high-heeled shoes.[61] In the 1700's Pennsylvania, a man could obtain a divorce if his wife had used cosmetics during courtship.[62] (Today, women in Iran are subject to dying for failing to cover their hair).

¶31 Cosmetics and shoes were not the only problem, especially when it came to women's sports and how they dressed. Basketball became the first women's team sport one year after it was invented by Dr. James Naismith in 1891. Senda Berenson Abbott, the director of physical culture at Smith College, taught the game to her students. Because the social institutions at the time emphasized the frailty of women and their place in the home, she modified the men's rules.[63] There was concern that women might suffer from nervous fatigue if the game was too strenuous. Some also worried that women might get the vapors, fall to the floor in a swoon, and have to be revived by smelling salts.[64]

¶32 Because of the concerns for women's frailty, her revisions of the rules confined players to three divisions of the court with two guards, two centers, and two forwards. They could not cross the line into another part of the court. Players were limited to three dribbles, and for a short time only two were allowed. The three sections were reduced to two in 1938.[65]

¶33 Initially, players wore some of the first trousers for women, a long-sleeved blouse, and knee-length skirts to protect their femininity. Although the introduction of trousers was criticized, in 1896, Clara Gregory Baer at Sophie Newcomb College replaced the initial uniforms. Loose bloomers worn over stockings were introduced. Still, only fingers, necks, and heads were exposed to public view. Male spectators were not allowed to watch the game because it was socially unacceptable.[66]

¶34 Although women outlive men by five years, women had apparently overcome the vapors, swoons, and frailty enough to play the full court in 1977.[67] However, in Oklahoma, they were not allowed to sprint down the full court in their short shorts and sleeveless tank tops with reckless abandon until 1995.[68] In 1996, the WNBA was established, and women had a league of their own. But this is not the end of the issue for women in sports. In 2023, Florida initially sought mandatory menstrual cycle reports from high school students before allowing girls to participate in sports. Subsequently, the Florida High School Athletic Association reversed this requirement after months of criticism and public outcry.[69]

¶35 Trousers weren't just a problem on the basketball court. They presented a problem in the trial courts as well. In 1938, Helen Hulin, a witness against two men who had burgled her home, was held in contempt and sent to jail by Judge Arthur A. Gurcrin for wearing trousers.[70] It was well understood by women appearing in the Oklahoma District Courts that trousers were verboten. However, the Federal District Courts were explicit. In 1994, the rules of the U.S. District Court of the Eastern District of Oklahoma, for women lawyers and employees provided: "women were to wear dresses and suits" ---- which did not include pant-suits.[71] The Oklahoma Supreme Court did not need to have a dress code barring trousers for women because there were no women lawyers working for the Supreme Court until 1972.

¶36 Until 1993 women were expressly forbidden to appear on the floor of the United States Senate in trousers. Newly elected Senator Carol Moseley Braun, who was unaware of the prohibition inadvertently wore her pant-suit to work. Senator Barbara Mikulski followed "suit" and the taboo ended.[72] As recently as 2014, a law professor expressed his reasons why women should not wear trousers. He wrote:

Women must veil their form to obscure its contours out of charity towards men. To know that women in pants have this effect on men and to wear them is a sin against charity as well as modesty.[73]

¶37 In 2017, what was called "the right to bare arms" in the United States Senate resulted in modernization of the prohibition against women wearing sleeveless tops or dresses without a sweater or jacket ---- or open-toe shoes. The women members celebrated by taking a group photo on the Capitol steps in their sleeveless tops and dresses. (However, this year the Missouri legislature reverted to the earlier dress code of the U.S. House of Representatives forbidding sleeveless attire.) Despite the open toes, sleeveless, or "trouser problem" on the basketball court, the courthouse or in Congress, women in Oklahoma had the right to terminate a pregnancy in order to preserve their life without a medical emergency.

CONCLUSION

¶38 The physical and mental abilities and attributes of women have always been questioned. When the steam locomotive was introduced, railroads were criticized because some thought that women's bodies were not designed to go at 50 miles per hour. The concern was that their uteri would fly out of their bodies if they were accelerated at that speed.[74]

¶39 With the invention of the automobile concerns much like those expressed for a woman serving on a jury arose. Allegedly, because women were prone to fantasy, physical weakness, and hysteria, they would lose control. Therefore, they should not be allowed to drive. This myth was dispelled by Alice Ramsey who, with three other women, drove across the country in 1909, even changing her own flat tire.[75]

¶40 Women were precluded from being astronauts because they had to be test pilots. Women were not allowed to be test pilots, so they could not be astronauts. Again, like qualifications for jury duty, because they could not be an elector, they couldn't serve on a jury. Or they couldn't be a lawyer because they lacked the ability to contract.

¶41 Now, women can drive cars, even competing in the Indy 500. Women can run in marathons, which was forbidden by the American Athletics Association until 1970, for fear they would be infertile. The next mission to the moon will include a woman who will travel thousands of miles per hour. The first Native American woman completed a space walk from the International Space Station in January of 2023. In the 2023 Super Bowl, fighter jets that flew over the game were piloted and crewed by women. Even so, a woman lacks the right she had in 1893, to terminate a pregnancy to preserve her life without qualification.

¶42 The analogy here is like and unlike a hot appendix. If a woman presented with a fever, elevated white cell count, and pain in the lower right quadrant of her body, the physician under the reasonable standards of medical practice, may remove it without waiting until it bursts in a "medical emergency." Evidently the same standard is inapplicable to eclampsia. Must an Oklahoma physician wait until their patient has a seizure, a stroke, experiences multiple organ failure, goes septic, or goes into a coma because of the fear of criminal prosecution?

¶43 This certainly appears to be a problem in Texas. For example, five women joined in Zurawaski v. State of Texas, No. D-1-GN-000968, filed in the District Court of Travis County Texas March 6, 2023, seeking a permanent injunction because physicians were afraid to provide necessary and potentially live-saving obstetrical care. According to their allegations, Amanda Z., after a year and a half of fertility treatments, exploratory procedures, uses of multiple medications, and treatment with intrauterine insemination finally got pregnant. However, at seventeen weeks complications arose from weakening cervical tissue, and she was told her baby would not survive. Because physicians were too fearful to treat her without her being in an emergent medical condition, she had to wait until she was septic and near death before they would act to preserve her life.

¶44 Two of the women, Lauren M. and Ashley B., each learned that one of their twins was not viable. They both had to travel out of state for treatment in order to save their lives and that of their remaining twin. Anna Z. was forced to fly across multiple states after her water broke, risking labor, septic shock, and hemorrhaging because, even though her baby would not survive, Texas physicians denied treatment for fear of prosecution.

¶45 Lauren H.'s baby had a condition where a skull would not develop with a severely underdeveloped brain and no chance of survival. She alleged that she could not get treatment in Texas. Her specialist couldn't help her and was even fearful to give her information about her options. The specialist would not provide a referral or even transfer her medical records to an abortion provider. Because neighboring states were inundated with appointments, she had to travel to Washington state -- it was the only state she could find that had an open appointment.

¶46 Although the Oklahoma Legislature is considering several bills which address termination, and there may be an initiative petition or referendum, this is the cause before us. We need to do our jobs, uphold our oaths of office, and address the issues without delay rather than speculate about what might be. For some women, the draconian law which allows no exception, in the absence of a medical emergency to preserve the life of the mother, may be a death sentence. In some instances, women may have fewer rights than a convicted murderer on death row. These women may be subject to a death sentence without being afforded due process or any provision for clemency or pardon. Imagine that.

FOOTNOTES

[1] Title 63 O.S. Supp. 2022 §1-731.4 provides:

A. As used in this section:

1. The terms "abortion" and "unborn child" shall have the same meaning as provided by Section 1-730 of Title 63 of the Oklahoma Statutes; and

2. "Medical emergency" means a condition which cannot be remedied by delivery of the child in which an abortion is necessary to preserve the life of a pregnant woman whose life is endangered by a physical disorder, physical illness or physical injury including a life-endangering physical condition caused by or arising from the pregnancy itself.

B. 1. Notwithstanding any other provision of law, a person shall not purposely perform or attempt to perform an abortion except to save the life of a pregnant woman in a medical emergency.

2. A person convicted of performing or attempting to perform an abortion shall be guilty of a felony punishable by a fine not to exceed One Hundred Thousand Dollars ($100,000.00), or by confinement in the custody of the Department of Corrections for a term not to exceed ten (10) years, or by such fine and imprisonment.

3. This section does not:

a. authorize the charging or conviction of a woman with any criminal offense in the death of her own unborn child, or

b. prohibit the sale, use, prescription or administration of a contraceptive measure, drug or chemical if the contraceptive measure, drug or chemical is administered before the time when a pregnancy could be determined through conventional medical testing and if the contraceptive measure, drug or chemical is sold, used, prescribed or administered in accordance with manufacturer instructions.

4. It is an affirmative defense to prosecution under this section if a licensed physician provides medical treatment to a pregnant woman which results in the accidental or unintentional injury or death to the unborn child.

[2] 1890, Statutes of Oklahoma Territory, provided:

(2187) §1. Every person who administers to any pregnant woman, or who prescribes for any such woman, or advises or procures any such woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the Territorial prison not exceeding three years, or in a county hail not exceeding one year. (Emphasis supplied.)

(2188) §2. Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with the intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in a county jail not exceeding one year, or by a fine not exceeding one thousand dollars, or by both. (Emphasis supplied.)

Like unto it, the statutes of Indian Territory, M.D., c. 45, §§1491-1961 (May 2, 1890) §932 provided:

It shall be unlawful for any one to administer or prescribe any medicine or drugs to any woman with child, with intent to produce an abortion or premature delivery of any fetus before the period of quickening, or to produce or attempt to produce such abortion by any other means: and any person offending against the provisions of this section shall be fined in any sum not less than one nor more than five years. Provided, that this section shall not apply to any abortion produced by any regular practicing physician for the purpose of saving the mother's life. (Emphasis supplied.)

[3] R.L. 1910, §2437 provides in pertinent part:

Submitting to or soliciting attempt to commit abortion. Any woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in the county jail not exceeding one year, or by a fine not exceeding one thousand dollars or by both. History. Dak. 6539 S. 1890, Sect. 2188. (Emphasis supplied.)

[4] The Okla. Const. art. 2, §2 provides:

All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry.

The Okla. Const. art. 2, §7 provides:

No person shall be deprived of life, liberty, or property, without due process of law.

[5] R.L. 1910 §2436 provided in pertinent part:

2436. Procuring an abortion. A person who administers to any pregnant woman, or who prescribes for any such woman, or advises or procures any such woman to take any medicine, drug, or substance, or uses or employs any instrument, or other means whatever, with intent thereby to produce the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the penitentiary not exceeding three years, or in a country jail not exceeding one year. History. Dak. 6538 S. 1890, Sec. 1287. (Emphasis supplied.)

[6] Preserve is defined by The Webster's New International 2nd ed. Dictionary (1950) as:

1. To keep or save from injury or destruction, to guard or defend from evil; to protect; to save . . .

[7] The Historical and Statutory Notes of the Schedule state as follows in pertinent

part:

The first legislative assembly of the Territory of Oklahoma, adopted the Dakota Code of 1887, as the 'Penal Code of the State of Oklahoma,' effective December 25, 1890. . .

As thus adopted in 1890, the Penal Code has been continued in force, substantially in its original form, in both the Territory and the State of Oklahoma.

Section 2 of the Schedule to the Constitution provides, in substance, that all laws in force in the Territory at the time of admission of the State, which were not repugnant to the Constitution and which were not locally inapplicable should be extended to and remain in force in the State until they expired by their own limitation or were altered or repealed.

Title 21 O.S. 2021 §1, which was originally enacted in 1910 (R.L. 1910 §2082), and has remained unchanged, provides that:

This chapter shall be known as the penal code of the State of Oklahoma.

[8] The Okla. Const. art 2, §26 provides:

The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited; but nothing herein contained shall prevent the Legislature from regulating the carrying of weapons.

[9] William H. Murray, President of the Oklahoma Constitutional Convention and the first Speaker of the House of Representatives, Henry S. Johnston, Secretary of the Constitutional Convention, First President Pro Tempore of the Oklahoma Senate and 7th Governor of Oklahoma, and Robert L Williams, the First Chief Justice of the Oklahoma Supreme Court and the 3rd Governor of Oklahoma, all signed the Constitution. In a letter from Murray, to the Secretary of the State of Oklahoma, C.C. Childers, on February 22, 1941, Murray listed people who did not sign the original because they did not have the opportunity to do so. However, he states that they would have signed the copy filed with the Secretary of State. Among them M.J. Kane, the second Chief Justice of the Oklahoma Supreme Court.

[10] Several previous Oklahoma Supreme Court decisions illustrate this concept. See, Umholtz v. City of Tulsa, 1977 OK 98, 565 P.2d 15, 24 (Okla.1977); Short v. Kiamichi Area Vocational-Technical School Dist. No. 7, 1988 OK 89, 761 P.2d 472, 478 (Okla.1988), cert. denied, 489 U.S. 1066 (1989); In re A.E,1987 OK 76, 743 P.2d 1041 (Okla.1987); In re D.D.F., 1990 OK 89, 801 P.2d 703, 706 (Okla.1990).

[11] During his confirmation hearings as Chief Justice, William Rehnquist remarked that he viewed the protections of the Federal Constitution as the floor, rather than a ceiling. Nomination of Justice William Hubbs Rehnquist: Hearings Before the Committee on the Judiciary United States Senate, 99th Cong., 2d Sess. 141 (1986).

[12] Michigan v. Long, 463U.S. 1032 (1983). There are a multitude of cases illustrating the floor-ceiling concept which reflect a state's constitution can provide greater rights than the federal constitution. For example, see Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 902 (1990); State of Alaska v. Enserch Alaska Construction, Inc., 787 P.2d 624 (Alaska 1989); In re T.W., 551 So.2d 1186 (Fla. 1989); State v. Kam, 69 Haw. 483, 748 P.2d 372 (1988); Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm, 160 Ariz. 350, 358, 773 P.2d 455, 463 (1989); Deer Valley Unified School Dist. No. 97 v. Superior Court, 157 Ariz. 537, 541, 760 P.2d 537, 541 (1988).

[13] Ephesians 5:22-23, 25, 28-29, King James Bible, (2023), https://www.kingjamesbibleonline.org, provides in pertinent part:

22 Wives, submit yourselves to your own husbands as unto the Lord. 23 For the husband is the head of the wife even as Christ is the head of the church: and he is the Savior of the body.

25 Husbands, love your wives, even as Christ also loved the church, and gave himself for it; . . .

28 So ought men to love their wives as their own bodies. He that loveth his wife loveth himself;

29 For no man ever yet hated his own flesh; but nourisheth and cherisheth it, even as the Lord the church:

[14] Serena Witzke, Blog: Domestic Violence in Ancient Rome and Game of Thrones, Society for Classical Studies, March 27, 2019, https://classicalstudies.org/scs-blog/switzke/blog-domestic-violence-ancient-rome-and-game-thrones; accessed December 19, 2022.
See also, Bozman v. Bozman, 376 Md. 461, 469-70, 830 A.2d 450, 455 (2003) for a discussion of the common law doctrine of interspousal immunity.

[15] Henry Ansgar Kelly, Rule of Thumb and the Folklaw of the Husband's Stick, Jo. Legal Educ., Vol. 44, No. 3, 341, 348 (1994). Http///www.jstor.org/stable.

[16] Bradley v. State, 1 Miss. 156, 158 (1824); State v. Rhodes, 61 N.C. 453, 456 (1868).

[17] Elizabeth Pleck, Criminal Approaches to Family Violence, 1640-1980, 11 Crime and Justice 19-20 &23 (1989), http://www.jstor.org/stable/1147525.

[18] Bozman v. Bozman, see supra note 11, at 469-70.

[19] Bozman v. Bozman, see see note 11 at 458.

[20] Majorie Brown, Chastisement: Wives and Slaves in Nineteeth Century North Carolina, (1993); Summary at https://repository. Library.georgetowen.edu/handle/10822/1051110.

[21] Harmon v. State, 1953 OK CR 106, 260 P.2d 422.

[22] Lynch v. State, 1940 OK CR 5, 98 P.2d 625, 627.

[23] Janice P. Dreiling, Women and Oklahoma Law: How It Has Changed, Who Changed It, and What is Left, 40 Okla. Law Rev. 417, 417-18, 426 (1987),(citing W. Blackstone, Commentaries on the Law, Ch. 15, at 189 (1941)); 76 O.S. Supp. 1976 §8.

[24] Title 32 O.S. Supp. 1973 §15 was enacted in 1973 to provide:

Women shall retain the same legal existence and legal personality after marriage as before marriage, and shall receive the same protections of all her rights as a woman, which her husband does as a man; and for any injury sustained to her reputation, person, property, character or any natural right, her own medical expenses, and by reason of loss of consortium, she shall have the same right to appeal in her own name alone to the courts of law or equity for redress and protection that her husband has to appeal in his one name alone.

The Tenth Circuit found that, in an Oklahoma federal court, a wife could recover in a diversity action for loss of consortium in an accident that occurred before the statutory change. The accident occurred before the statutory changes, and the Court determined that before the statutory change, the law was unconstitutional. Duncan v. Gen. Motors Corp., 499 F.2d 835 (10th Cir. 1974).

[25] From 1910 to 1981, the statutory language of 21 O.S. 1981 §1111 remained unchanged. It provided in pertinent part:

Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator . . . .

[26] Title 21 O.S. Supp. 1993 §1111. Ironically, even though an employer was not required to pay for women's birth control, it voluntarily paid for Viagra, vasectomies, and condoms. Nicole Leinbach-Reyhle, The Hobby Lobby Mess: 3 Quick Facts You Need to Know, Forbes July 2,2014. https://www.forbes.com/sites/nicoleleinbachreyhle/2014/07/02/the-hobby-lobby-mess-3-quick-facts-you-need-to-know-about/?sh=4914561423a8.

[27] The South Carolina Constitution art. 17, §3 provided:

Divorce from the bonds of matrimony shall not be allowed in this state.

Even a federal judge could not get a divorce in South Carolina. Judge J. Waties Waring who presided over the case of Isaac Woodward Jr., and who later became a civil rights icon, asked his wife of thirty years to move to Florida, establish residency, and file for divorce. Waring is also known for laying the ground work for the United States Supreme Court to decide Brown v. Board of Education, 347 U.S. 483 (1954). Love Stories, Equal Partners, Charleston Magazine, February 2010. https://charlestonmag.com/features/love_stories.

[28] 108 Stat. 1796, 42 U.S.C. ch. 136 (1994). The VAWA also applies to men. In Oklahoma, the word "men" includes "women." See discussion ¶14, infra. Questions and Answers: Abused Spouses, Children and Parents Under the Violence Against Women Act (VAWA), United States Citizenship and Immigration Services, Feb. 10, 2022. Https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents/questions-and-answers-abused-spouses-children-and-parents-under-the-violence-against-women-act-vawa.

[29] William Blackstone, Commentaries on the Law, ch. 15, at 189 (1941).

[30] Mallory Reader, The Feminism of Property Rights, The Cato Blog, March 22, 2021, https://www.cato.org/blog/feminism-property-rights. See also, Amelia Jenks Bloomer, Have Women Souls?, The Lily, vol. II., No. 3 at 21, March 1, 1850, reprinted in The Radical Women's Press of the 1850's 198-99 (Women's Source Library, vol. II., Ann Russo & Charis Kramaroe eds., 2001)

[31] Woody Holton, Abigail Adams, Free Press, 2009, page 99. Holton notes:

Years later these words would transform Adams into a feminist icon, and it is easy to forget that she wrote them for an audience of one. Moreover, out of all the contexts in which men lorded it over women in politics, the courts, the workplace, and so on and on and on - she only called attention to one: marriage.

[32] Woody Holton, Abigail Adams, The New York Times, December 11, 2009.

[33] Mallory Reader, The Feminism of Property Rights, The Cato Blog, March 22, 2021, https://www.cato.org/blog/feminism-property-rights.

[34] 1905 Okla. Terr. Sess Law, ch 18, at 255.

[35] Jessica Hill, Post Detailing 9 Things Women Couldn't Do Before 1971 Is Mostly Right, USA TODAY, October 28, 2020.

[36] Maria Cristina Santana, From Empowerment to Domesticity, The Case of Rosie the Riveter and the WWII Campaign, Frontiers in Sociology, 23 December 2016
Sec. Gender, Sex and Sexualities Volume 1 - 2016 | https://doi.org/10.3389/fsoc.2016.00016.

[37] National Committee on Pay Equality, The Wage Gap over Time: In Real Dollars, Women See a Continuing Gap, https://www.pay-equality.org/info-time.html.

[38] Equal Pay Act of 1963 and Lilly Ledbetter Fair Pay Act of 2009, United States Equal Opportunity Employment Commission, https://www.eeoc.gov/laws/guidance/equal-pay-act-1963-and-lilly-lefbetter-fair-pay-act-2009.

[39] Hansen, Michael; Quintero, Diana; Zerbino Nicholas; Public Schools Heavily Rely on Women's Labor. Why do they Pay Female Teachers Less? Brookings Institution, March 9, 2023; https://www.brokings.edu/research/gender-wate-gaps-policy-brief/.

[40] The Women's Right Movement, 1848-1917, History, Art & Archives, United States House of Representatives, Historical Essay: I'm No Lady; I'm a Member of Congress. On August 1832, the first women's suffrage petition was presented to British Parliament. The British Library, Women's Suffrage Timeline, https://www.bl.uk/votes-for-women/articles/womens-sufferage-timeline#footnote 1.

[41] Oelerking v. Hiatt, 1918 OK 38, ¶11, 170 P. 476. See also, National Park Service Article, Oklahoma and the 19th Amendment, https://www.nps.gov/articles/oklahoma-and-the-19th-amendment.htm (citing, Ida Husted Harper, History of Women's Suffrage, 1900-1920, Vol. 6 (1923); the National Amendment Women Suffrage, Ass'n Papers (Library of Congress, National Register Nominations from the National Park Service. The Okla. Const. art. 3, §1 required electors to be "male." Art. 3, §3 provided that:

Until otherwise provided by law, all female citizens of this state, possessing like qualifications of male electors, shall be qualified to vote at school district elections or meetings.

Native women did not have the same voting rights as white women until five years after suffrage was granted in Oklahoma. Native Americans were excluded from citizenship when the U.S. Constitution was ratified in 1788. Scott v. Sanford, 60 U.S. 393 (1857). Upon the ratification of the 14th Amendment, African Americans were granted citizenship and the right to vote, but the law was interpreted as inapplicable to Native American men. Becky Little, Native Americans' Long Journey to US Citizenship and Voting Rights, https://www.history.com/news/native-american-voting-rights-citizenship (updated Sep. 28, 2022) Nevertheless, the Oklahoma Constitution gave them this right. Native people were finally granted citizenship with the passage of the Indian Citizenship Act, also known as the Snyder Act in 1924. 43 Stat. 252.

[42] Under the Oklahoma statute, R.L. 1910, §3118 which provided:

The qualified electors of the State shall be male citizens of the United States, male citizens of the State, and male persons of Indian descent, native of the United States who are over the age of twenty-one years, who have resided in the State one year, in the county six months, and in the election precinct thirty days next preceding the election at which any elector offers to vote: Provided, that no person adjudged guilty of felony after the adoption of the constitution of this State, subject to such exceptions as the legislature may prescribe, unless his citizenship shall have been restored in the manner provided by law; not any person while kept in a poorhouse or other asylum at the public expense except Federal and Confederate ex-soldiers: nor any person in a public prison, nor any idiot or lunatic, shall be entitled to vote at any election under the laws of this State.

The Constitution did not change until 1978 by legislative referendum. The revised Okla. Const. art. 3, §1, provides:

Subject to such exceptions as the Legislature may prescribe, all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state.

[43] Title 25 O.S. 2021 §24.

[44] In re House Bill No. 145, 1951 OK 288, ¶14, 237 P.2d 364. The electors in the Constitutional provisions, art. 3, §1, see note 42, supra, provided that qualified electors of the State shall be "male" citizens. The only reference to "men" in the Constitution is art. 2, §18 and 19, which referred to grand jury and the right to trial by jury of "men."

[45] Oklahoma Statutes, 1910 §3698 provided:

Qualifications and exemptions. All male citizens, residing in this State, having the qualifications of electors, of sound mind and discretion, of good moral character, not justices of the supreme court or judges of the criminal court of appeals, district court, superior court or county court, sheriffs or deputy sheriffs, constables, jailers, licensed attorneys engaged in the practice of law, habitual drunkards, not afflicted with a bodily infirmity amounting to a disability, and who have never been convicted of any infamous crime or served a term of imprisonment in any penitentiary, for the commission of a felony, are competent jurors to serve on all grand and petiti juries within their counties: Provided, that persons over sixty years of age, ministers of the gospel, and county or district officials, practicing physicians, undertakers, pharmacists, teachers in public schools, postmasters, and carriers of the United States mail, members of the national guard, and all members of good standing of any regular organized fire department, if they claim their exemption shall not be compelled to serve as jurors in this State.

[46] J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 132-33 (1994).

[47] Kim Viner, Women on the Jury: Wyoming Makes History Again, WyoHistory.org. A project of the Wyoming Historical Society, January 2, 2020.

[48] In re House Bill No. 145, 1951 OK 288, ¶19, 237 P.2d 624; 38 O.S. 1951 §28.

[49] Title 22 O.S. 2011 §311 provides:

A grand jury is a body of men consisting of twelve jurors impaneled and sworn to inquire into and true presentment make of all public offenses against the state committed or triable within the county for which the court is holden.

[50] Janice P. Dreiling, Women and Oklahoma Law: How It Has Changed, Who Changed It, and What is Left, 40 Okla. Law Rev. 417, 426 (1987), (citing W. Blackstone, Commentaries on the Law, Ch. 15, at 189 (1941)). Title 76 O.S. Supp. 1976 § 8; R. Darcy, Women Suffrage in Oklahoma, Oklahoma Women's Almanac (2005).

[51] Gilliland v. Whittle, 1912 OK 663, ¶3, 127 P. 698.

[52] Looney v. Leeper, 1930 OK 455, 292 P. 365.

[53] State Question No. 302, S.J.R. No. 18, 1942 Okla. Sess. Law 542, amending the provisions of Okla. Const. art. VI, §3 to read:

No person shall be eligible to the office of Governor, Lieutenant Governor, Secretary of State, State Auditor and Inspector, Attorney General, State Treasurer or Superintendent of Public Instruction except a citizen of the United States of the age of not less than thirty-one (31) years and who shall have been ten (10) years next preceding his or her election, or appointment, a qualified elector of this state.

[54] Supreme Court of the United States, In re Lady Lawyers: The Rise of Women Attorneys and the Supreme Court, https://www.supremecourt.gov/visiting/exhibitions/LadyLawyers/Default.aspx.

[55] Bradwell v. State of Illinois, 83 U.S. 132 (1872) quoting In re Bradwell, 55 Ill. 535, 539, 1869).

[56] Melissa DeLacerda and Patsy Trotter, Oklahoma's Women Lawyers, Oklahoma Women's Almanac, 39 (2005).

[57] American Bar Association, Profile of the Legal Profession 2022, Women in the Legal Profession. https://www.abalegalprofile.com/women.php.

[58] Melissa DeLacerda and Patsy Trotter, Oklahoma's Women Lawyers, Oklahoma Women's Almanac, 39 (2005).

[59] Mary Fallin, National Governors Association. https://www.NGA.org/governor/mary-fallin/.

[60] There is still a prejudice about "women drivers."

[61] Footalk, Sumptuary Laws of the Seventeenth Century, History of Sumptuary Laws Blog (Mar. 7, 2022) http://sumptuarylaw.blogspot.com/2010/08/sumptuary-laws-of-seventeenth-century.html.

[62] Sarah E. Schaffer, Reading Our Lips: The History of Lipstick Regulation in Western Seats of Power, Food and Drug Law Journal, Vol. 62, No. 1, 165-225, (2007). http://www.jstor.org/stable/26660916.

[63] Sally Jenkins, History of Women's Basketball (July 3, 1997), https://www.wnba.com/news/history-of-womens-basketball/.

[64] Sally Jenkins, History of Women's Basketball, https://www.wnba.com/news/history-of-womens-basketball/ (July 3, 1997).

[65] Sally Jenkins, History of Women's Basketball, https://www.wnba.com/news/history-of-womens-basketball/ (July 3, 1997).

[66] Sally Jenkins, History of Women's Basketball, https://www.wnba.com/news/history-of-womens-basketball/ (July 3, 1997).

[67] Sally Jenkins, History of Women's Basketball, https://www.wnba.com/news/history-of-womens-basketball/ (July 3, 1997).

[68] Ray Soldan, 6-on-6 Was Original Girls Game in State, Oklahoman, March 10, 1995, https://www.oklahoman.com/story/news/1995/03/10/6-on-6-was-original-girls-game-in-state/62397932007/ (March 10, 1995).

[69] Carlos Suarez and Devon M. Sayers, Florida High School Athletic Association Removes All Questions About Menstruation From Required Medical Evaluation Form, www.cnn.com, Feb. 9, 2023; Sarah McCammon, Young Florida Athletes Won't Have to Share Their Menstrual Cycle Details to Compete, www.npr.org Feb. 9, 2023.

[70] Scott Harrison, California Retrospective: In 1938, L.A. Woman Went to Jail for Wearing Slacks in Courtroom, L.A. Times (Oct. 23, 2014). https://www.latimes.com/local/california/la-me-california-retrospective-20141023-story.html (Oct. 23, 2014).

[71] Bethanne W. McNamara, All Dressed Up with No Place to Go: Gender Bias in Oklahoma Federal Court Dress Codes, 30 Tulsa L.J. 395 (2013), https://digitalcommons.law.utulsa.edu/tlr/vol30/iss2/5.

[72] Jocelyn Sears, Why Women Couldn't Wear Pants on the Senate Floor Until 1993, (March 22, 2017) https://www.mentalfloss.com/article/93384/why-women-couldnt-wear-pants-senate-floor-until-1993.

[73] Brian McCall, To Build the City of God: Living as Catholics in a Secular Age, (2014). Drew Hutchenson, OU Daily (Sept. 30, 208), OU Law Professor, Associate Dean Expresses Homophobic, Sexist Views in 2014. https://www.oudaily.com/ou-law-professor-associate-dean-expresses-homophobic-sexist-views-in-2014-book/article_b023ece8-c50b-11e8-8678-a71250ce7740.html.

[74] Beth Dreher, 7 Shocking Things Women Weren't Allowed To Do Until Pretty Recently, Women's Day, Aug. 12, 2016.

[75] Marina Koestler Ruhen, Alice Ramsey's Historic Cross-Country Drive, Smithsonian Magazine, June 4, 2009.

 

 

COMBS, J., with whom Edmondson, J., joins, concurring specially:

¶1 I concur in the majority opinion.

¶2 I write separately to express my opinion on the scope of the provisions of Article II, Section 2 of the Oklahoma Constitution. This provision does not have a similar counterpart in the federal Constitution. Article II, Section 2 provides every Oklahoman, regardless of sex, the inherent right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry--a substantive right to life, liberty, and pursuit of happiness rather than a procedural right. The use of the term "inherent" right is defined in Webster's dictionary as "firmly or permanently contained or joined; infixed; . . . belonging by nature; inalienable."[1]

¶3 Of note, the Oklahoma Constitution also provides that no person shall be denied life, liberty, or property without due process of law. See Okla. Const. art. II, § 7. Section 7 would provide a similar procedural right to due process as provided in the Fourteenth Amendment to the United States Constitution. The Oklahoma Constitution thus provides a substantive right to life, liberty and the pursuit of happiness as well as a procedural right to due process such that the right to life, liberty or property cannot be denied - a purposeful combination, that confers greater rights than that conferred in the United States Constitution.[2]

¶4 At the very core of the inherent right of life, liberty and the pursuit of happiness is the principle that an individual should be free to make choices about how to conduct their own lives, to have the right to personal autonomy. The Oklahoma Constitutional provisions provide for every individual to have the right to life and liberty which would include a right to privacy and personal autonomy. Many states have reached similar conclusions. See Hodes & Nauser, MDs, P.A. v. Schmidt, 309 Kan. 610, 440 P.3d 461 (2019). "Every human being of adult years and sound mind has a right to determine what shall be done with their own body." Schloendorff v. Soc'y of N.Y. Hosp., 211 N.Y. 125, 129-30, 105 N.E. 92 (1914). "[E]veryone has a fundamental right to the sole control of his or her person." In re Guardianship of Browning, 568 So. 2d 4, 10 (Fla. 1990). "Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will." In re Brown, 478 So. 2d 1033, 1039 (Miss. 1985). Each of these concepts of control over one's body and of self-determination have roots in common law, as noted by the United States Supreme Court in Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251 (1891).

¶5 In light of the provisions of Article II and the state's historical protection for the life of the mother, the majority opinion finds the constitutional protection of the right to life does embody the right to choose to terminate a pregnancy to preserve the life of the mother, without discussion of the viability of the fetus. Any statutory provision banning the procedure or limiting the access to the procedure must be viewed with strict scrutiny.[3]

¶6 The medical community in determining within a reasonable degree of medical certainty the steps to preserve and protect the life of the mother is not without boundaries. During the course of pregnancy, there exists a timeline of urgency. We must define the right to preserve the life of the mother to mean something more than waiting until she actually has a life threatening medical emergency before she is allowed to receive treatment to terminate a pregnancy. If not, the healthcare practitioner will continue to face the impossible dilemma of deciding how close to death the woman must be to provide medical care while fearing such actions are outside the confines of the law. How imminent must death be?[4]

¶7 To be clear the State of Oklahoma has a legitimate interest in protecting the life of a viable unborn fetus. The medical timeline of urgency in a pregnancy crosses a moment in time where the physician must also protect the life of the viable fetus in addition to the life of the mother. However, at that point in the pregnancy, the medical profession must turn its focus to not only the mother but the viable fetus and the protections of life, liberty and pursuit of happiness must attach to that life as well. With the advancements of medicine and science, whether or not a bright line for a determination of viability is necessary to provide some protection for the viable fetus as well as a clear boundary for both the medical practitioners and all Oklahomans becomes a policy question for the people of the State of Oklahoma.

FOOTNOTES

[1] Webster's New International Dictionary of the English Language 1109 (rev. ed. 1922).

[2] Justice Kuehn states in her dissent that this Court would agree that the plain language of our Constitution does not protect a woman's right to terminate her pregnancy. She states that the framers of our Constitution did not include such a right. The per curiam opinion, however, found the Constitution protects a limited right to terminate a pregnancy which has been a consistent part of our history. It is clear the laws allowing a woman to terminate a pregnancy to preserve her life existed prior to statehood, carried through the passage of our Constitution and were again codified after statehood in the 1910 Revised Laws. Section 2 of the Schedule to the Oklahoma Constitution provides:

All laws in force in the Territory of Oklahoma at the time of the admission of the State into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the State of Oklahoma until they expire by their own limitation or are altered or repealed by law.

When the 1910 Revised Laws again allowed procurement of a miscarriage to preserve the life of the mother it provided an unbroken history acknowledging such right. The Third Legislature of the State of Oklahoma was surely aware of the framers' work and did not consider such laws to be "repugnant" to our Constitution. The per curiam opinion finds this historical right is protected under Sections 2 and 7 of Article II of the Oklahoma Constitution which have been part of our Constitution since its ratification in 1907. The opinion does not create a right where none existed. The opinion only points out that it had been unnecessary in the past for this Court to make that determination when a right to terminate a pregnancy had previously been found to exist under the federal Constitution.

[3] The Vice Chief Justice's dissent states that this Court has avoided answering the question in our previous decisions as to whether the Oklahoma Constitution provides a right to terminate a pregnancy. He notes that thirty years ago we were asked to review the constitutionality of a proposed ballot measure which would have criminalized abortion except for four limited circumstances: (1) to save the life of the mother or avoid grave impairment of her physical or mental health, (2) where the pregnancy resulted from rape, (3) where the pregnancy resulted from incest, and (4) where the unborn child would be born with a grave physical or mental defect. In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, ¶11, 838 P.2d 1, 6. The dissent asks "why did the Court prevent the People from deciding these rights thirty years ago?" The reason is simple. Thirty years ago the right to terminate a pregnancy was based upon the United States Supreme Court's interpretation of the U.S. Constitution, which it had found, protects a woman's right to choose prior to the viability of the fetus. The initiative petition in In re Initiative Petition No. 349 criminalized abortion without consideration of the rights of the mother that were protected by the U.S. Constitution as interpreted at that time. We could not have held that a woman in Oklahoma has less rights under the proposed state constitutional amendment when the U.S. Constitution, at that time, protected those rights. The dissent is also inconsistent with the position taken in the dissent to In re State Question No. 807, Initiative Petition No. 423, 2020 OK 57, 468 P.3d 383 (Rowe, J. dissenting). In that case the dissent asserted a proposed state constitutional amendment legalizing marijuana would be preempted by federal law (The Controlled Substances Act, 21 U.S.C. §§ 801-904). Therefore, the position taken by the dissent in that opinion would have prevented the people from deciding the right to legalize marijuana based upon an alleged federal preemption. An entirely inconsistent position concerning federal supremacy.

The dissent also asserts there is a pending joint resolution in the Oklahoma House of Representatives calling for a referendum on the "Oklahoma Abortion Law Act of 2023." As the dissent notes, there currently is no substantive language in the joint resolution. The joint resolution is a shell at this stage and this Court cannot speculate what it may or may not contain in the future or how whatever language it may contain will be voted on by the people. As the United States Supreme Court has determined, pending legislation throws little light on the policy of the Legislature. See United States v. Am. Trucking Ass'ns, 310 U.S. 534, 550 (1940). Pending legislation is no obstacle to this Court deciding a matter properly presented to this body.

[4] Justice Darby's dissent suggests that our precedents would require application of the rational basis standard of review, quoting Edmondson v. Pearce, 2004 OK 23, 91 P.3d 605, for the proposition that courts may not annul a statute "as being in violation of substantive due process unless it is clearly irrelevant to the policy the Legislature may adopt or is arbitrary, unreasonable or discriminatory." Darby, J., Dissenting Op. ¶ 10 (quoting Pearce, 2004 OK 23, ¶ 35, 91 P.3d at 624). His dissent further quotes the Pearce case for the propositions that "[t]he inherent right to 'life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own labor' guaranteed to the people by Sec. 2, Art. 2, of the state constitution, is subject to reasonable regulation in the exercise of the police power" and that such "rights guaranteed in OKLA.CONST. art. 2, § 2 are qualified. They are not absolute." Darby, J., Dissenting Op. ¶ 12 (quoting Pearce, 2004 OK 23, ¶¶ 34--35, 91 P.3d at 624). But the Pearce case itself concerned cockfighting, and whether Article II, Sections 2 and 7 of the Oklahoma Constitution gave rise to a constitutional right to engage in cockfighting that would invalidate a law enacted by the people of Oklahoma to ban the practice. This case concerns people's lives. Just because we applied the rational basis standard of review to a statute that banned cockfighting, that doesn't mean we must--or even should--apply the same standard of review to a statute that could dictate the deprivation of a woman's life. A woman's right to life is more important than society's right to watch roosters fighting each other, and it should consequently be afforded greater protection--including the application of heightened scrutiny toward any statute that would deprive her of life.

 

 

KANE, C.J., dissenting: 

¶1 Driven most certainly by a commendable kindness of heart, the majority engages in legal contortions to protect pregnant women who are in medical peril by fashioning Oklahoma Constitutional precepts of abortion law that simply do not exist. There is no expressed or implied right to abortion enshrined in the Oklahoma Constitution. In interpreting our Constitution, this Court must guard against the innate human temptation to confuse what is provided in the Oklahoma Constitution with what one wishes were provided.

¶2 Today, the Court has elected to retain jurisdiction over the construction of two criminal statutes (for which we are not the Court of last resort), seemingly holding that one anti-abortion statute is constitutional,[1] yet expressing no opinion upon the constitutionality of the very same statute.[2] The other anti-abortion statute[3] is discarded as vague and contrary to a newly discovered inherent constitutional right to abortion in Oklahoma.

¶3 At the time of ratification, the Oklahoma Constitution was the most detailed state governing document in the United States.[4] Oklahoma's Constitution is still currently the third-most detailed Constitution in the nation, now containing almost 85,000 words.[5] Had the framers chosen to classify abortion under any scenario as a fundamental Oklahoma right, rather than a felony, they certainly would have done so explicitly, not by implication. Our Constitution is a highly detailed enumeration of rights, not a broad, sweeping statement of concepts. Nowhere, broadly or specifically, is a right to abortion enumerated.

¶4 Much is made of the fact that the anti-abortion statutes in effect shortly before and shortly after Statehood had "life of the mother" exceptions. However, little is spoken of the fact that abortion, generally, was a criminal offense which would send one to prison. While the legislators of the time appeared unwilling to make abortions that saved the life of the mother a matter of criminal law subjecting offenders to prison, this is completely different from enumerating a fundamental right to abortion. Indeed, it takes more to be a fundamental right than merely to be exempted from criminal prosecution.

¶5 The reason that the "life of the mother" exceptions do not resolve the question is because the majority analysis wholly disregards the interest of the unborn. The unborn have no voice, say, or consideration in the opinion of the majority. The thorny medical, philosophical, and practical debate of balancing the developing life of the unborn against the life of the mother, and the government's involvement in those decisions, is a necessary and worthy dialogue for the people to commence, but our existing Constitution pronounces no fundamental right to abortion to consider as part of that dialogue.

¶6 This Court should adhere to the Constitution given to us, not craft what we believe to be a "better" Constitution. That power lies with the people.[6] As Justice Thomas noted in his dissent to Obergefell v. Hodges: "By straying from the text of the Constitution, substantive due process exalts judges at the expense of the People from whom they derive their authority." 576 U.S. 644, 722 (2015) (Thomas, J., dissenting).

¶7 Certainly, the people of this great state have had the opportunity to amend the Oklahoma Constitution to speak to the debate over abortion rights. Although the Oklahoma Constitution has been amended over 150 times since statehood,[7] there has been no amendment passed to provide rights to abortion. Granted, since the surprising intervention in 1973 by the United States Supreme Court, creating an abortion right in Roe v. Wade, many on both sides of the debate felt that action to amend the Oklahoma Constitution to speak to abortion was rendered moot by the Federal preemptive effect of Roe.

¶8 What was the Oklahoma legislature's reaction to Roe? As the Petitioners critically note, the Oklahoma legislature has repeatedly striven since 1973 to enact legislation to protect the lives of unborn Oklahomans, given the limitations imposed by the United States Supreme Court. This Court was duty-bound to abide by Roe v. Wade, and we hence struck down many such legislative attempts to regulate abortion.

¶9 Recently the same United States Supreme Court revisited Roe, and concluded:

Roe was egregiously wrong from the start. Its reasoning was exceptionally weak, and the decision has had damaging consequences. And far from bringing about a national settlement of the abortion issue, Roe and Casey have enflamed debate and deepened division.

Dobbs v. Jackson Women's Health Org., 142 S.Ct. 2228, 2243.

¶10 Dobbs was well reasoned, and we would be well advised to follow the precise analysis and logic employed by the United States Supreme Court and conclude the obvious: the Oklahoma Constitution, as drafted and amended, contains no right to abortion, and an analysis of Oklahoma history and traditions suggests that no fundamental right to abortion was designed into our governing document.

¶11 Had this Court so concluded, the proper standard of review of the statutes in question would have been to inquire as to whether or not the statutes merely had a rational basis,[8] as opposed to the more stringent "strict scrutiny" analysis chosen by the majority. Employing rational-basis review clearly causes the statutes to pass constitutional muster, as the State clearly has a legitimate interest in protecting the unborn. Under what circumstances might a just and humane society limit the state's right to regulate abortion? Much was said of this issue in the briefing, but our state Constitution, as presently constituted, provides this Court no power to make these policy choices. This power is reserved to the people.

¶12 Having noted at length my profound concerns with what I believe is a fundamentally flawed opinion by the majority, what will be the effect of our decision to weigh in on a matter of criminal law? Oklahoma is one of only two states in the union with two courts of last resort.[9] While the Oklahoma Supreme Court indeed has superintending control over all courts of this state,[10] the court of last resort for all matters of criminal law is the Oklahoma Court of Criminal Appeals. The Oklahoma Supreme Court was certainly content to abide by the holdings of the Oklahoma Court of Criminal Appeals in 1973, when the Court of Criminal Appeals held that Roe v. Wade nullified criminal statutes against abortion, on Constitutional grounds. See Jobe v. State, 1973 OK CR 51, ¶ 4, 509 P.2d 481, 482.

¶13 Extant law suggests that if the Court of Criminal Appeals should later take up the Constitutionality of these same statutes and come to new or different conclusions, we will have a Constitutional crisis. Specifically, should a Constitutional challenge be presented to the Court of Criminal Appeals, and that Court rules upon the issues specifically not ruled upon herein, will that become the law of the land? As observed by the first Justice Kane in 1912: "It is the settled policy of the Supreme Court to follow the construction given to criminal statutes by the Criminal Court of Appeals since the enforcement of such statutes must be in accordance with such construction." State v. Russell, 1912 OK 425, 124 P. 1092, 1092.

¶14 Having improvidently created a new fundamental right under the Oklahoma Constitution, the majority almost, but not quite, upholds the constitutionality of 21 O.S.2021, § 861. Thereafter, 63 O.S. Supp. 2022, § 1-731.4 is rejected as vague. The net result of this opinion will be to raise more questions than it answers. Those who philosophically agree with the result may find the analysis provided by the slim majority to be satisfying, but the lack of clarity existing prior to today's pronouncement is not improved. We have squandered the opportunity to clearly advise the people that the Oklahoma Constitution, as currently worded, has no expressed or hidden fundamental abortion right under any circumstance. Any change to that status quo must come from the people or their elected representatives.

¶15 I dissent.

FOOTNOTES

[1] See 21 O.S.2021, § 861.

[2] At paragraph 10 of the majority opinion, the Court states: "We make no ruling on whether the Oklahoma Constitution provides a right to an elective termination of a pregnancy, i.e., one made outside of preserving the life of the pregnant woman as we have defined herein."

[3] See 63 O.S. Supp. 2022, § 1-731.4.

[4] https://oklahoma.gov/labor/transparency/oklahoma-state-constitution.html#:~: text=At%20its%20ratification%2C%20the%20Oklahoma,been%20approved%20by%20Oklahoma%20voters.

[5] https://en.wikipedia.org/wiki/State_constitution_(United_States)#:~:text=
The%20shortest%20is%20the%20Constitution,long%2C%20but%20rewritten%20in%202022.
In contrast, the Vermont Constitution is only 1/10 the length of our Constitution, with merely 8,565 words.

[6] The United States Supreme Court expressly held as follows, pertaining to abortion: "We therefore hold that the Constitution does not confer a right to abortion. Roe and Casey must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives." Dobbs v. Jackson Women's Health Org., 142 S.Ct. 2228, 2279 (2022).

[7] See supra note 1.

[8] Indeed, this is precisely what the United State Supreme Court did in Dobbs. It held "[u]nder our precedents, rational-basis review is the appropriate standard for such challenges. As we have explained, procuring an abortion is not a fundamental constitutional right because such a right has no basis in the Constitution's text or in our Nation's history." Dobbs, 142 S.Ct. at 2283.

[9] "Oklahoma is one of only two states--the other being Texas--with two courts of last resort: one with civil appellate jurisdiction and the other criminal." Greg Eddington, The Jurisdictional Boundary Between the Oklahoma Supreme Court and the Court of Criminal Appeals: Blurred Lines, 69 Okla. L. Rev. 203 (2017).

[10] Okla.Const.art 7, § 4.

 

 

ROWE, V.C.J., dissenting:

¶1 The Oklahoma Constitution declares that all political power in this state is vested in the People.[1] In today's post-Roe environment, abortion policy presents a political question that should be decided by the People.

¶2 The Oklahoma legislature forbid elective abortion in 1910, only three years after statehood. Title 21, Section 861 of the Oklahoma Statutes, initially enacted in 1910, provides:

Every person who administers to any woman, or who prescribes for any woman, or advises or procures any woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life shall be guilty of a felony punishable by imprisonment in the State Penitentiary for not less than two (2) years nor more than five (5) years.

21 O.S.2011, § 861. Section 861 prevailed in Oklahoma for 63 years until a United States District Court determined it was unconstitutional in light of the United States Supreme Court's decision in Roe v. Wade, 410 U.S. 113 (1973). See Henrie v. Derryberry, 358 F.Supp 719 (1973).

¶3 Over many decades, when asked to review the constitutionality of regulations on abortion, this Court relied exclusively on the principles of federal supremacy and precedents of the Supreme Court of the United States recognizing a woman's right to an abortion, including Roe v. Wade, 410 U.S. 113; Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833; and their progeny.[2]

¶4 More than thirty years ago, in In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, 838 P.2d 1, we were asked to review the constitutionality of a proposed ballot measure in light of the Supreme Court's then-recent pronouncement in Casey. The initiative petition would have criminalized abortion except in four instances: (1) to save the life of the mother or avoid grave impairment of her physical or mental health, (2) where the pregnancy resulted from rape, (3) where the pregnancy resulted from incest, and (4) where the unborn child would be born with a grave physical or mental defect. Id. ¶ 11, 838 P.2d at 6. We found the petition unconstitutional, as it imposed on a woman's right to obtain an abortion before the fetus obtains viability.[3] Justice Kauger, writing for the majority, outlined the limited nature of our review:

We are doubly bound to uphold the law of the land. Our limited role, like the role of all state courts in such cases, is to apply federal constitutional law, not to make it nor to guess what it may become. By virtue of our constitutional oath of office, we have solemnly sworn to uphold the Constitution of the United States. Roe and Casey may be overruled. The Freedom of Choice Act of 1992, now pending before Congress, which would codify Roe, may be enacted. Or, the proponents may present a proper petition for submission to a vote of the people. Speculation as to which of many paths the law in a given area will take in the future is a transparent veil behind which people act out of their own policy preferences. "Guesses" about the future development of any rule of law have never been an acceptable rule of decision in Anglo American jurisprudence.

We will uphold the law of the land whatever it may be. Today, the law of the land is that a woman has a constitutionally protected right to make an independent choice to continue or to terminate a pregnancy before viability.

Id. ¶¶ 13-14, 838 P.2d at 7. This pronouncement has served as the bedrock of our abortion jurisprudence for the three decades since.

¶5 In Oklahoma Coalition for Reproductive Justice v. Cline, 2019 OK 33, 441 P.3d 1145, we struck down a law requiring abortion providers to adhere to an outdated Food and Drug Administration protocol when administering two drugs commonly used to perform medication abortions because it imposed an undue burden on a woman's right to obtain an abortion. In doing so, we reaffirmed our commitment to federal supremacy and reiterated our position from In re Initiative Petition No. 349 that we will uphold the law of land, whatever it may be at the time. Cline, 2019 OK 33, ¶ 43, 441 P.3d at 1161 (citing In re Initiative Petition No. 349, 1992 OK 122, ¶ [14], 838 P.2d at 7). "Until overturned by the Supreme Court, all of Oklahoma and each department are bound by the Supreme Court's jurisprudence, and any legislation which places limits on a woman's right to an abortion of a pre-viable fetus must pass this undue burden test." Cline, 2019 OK 33, ¶ 5, 441 P.3d at 1162 (Combs, J., concurring specially)(emphasis added).

¶6 Then, on June 24, 2022, the Supreme Court of the United States, in Dobbs v. Jackson Women's Health Organization, 142 S.Ct. 2228, did overrule both Roe and Casey, finding that the United States Constitution does not provide a right to abortion. One of the Supreme Court's reasons for overruling Roe and Casey was that those decisions improperly removed questions of public policy from the democratic process:

As the Court's landmark decision in West Coast Hotel illustrates, the Court has previously overruled decisions that wrongly removed an issue from the people and the democratic process. As Justice White later explained, "decisions that find in the Constitution principles or values that cannot fairly be read into that document usurp the people's authority, for such decisions represent choices that the people have never made and that they cannot disavow through corrective legislation. For this reason, it is essential that this Court maintain the power to restore authority to its proper possessors by correcting constitutional decisions that, on reconsideration, are found to be mistaken." Thornburgh, 476 U.S. at 787, 106 S.Ct. 2169 (dissenting opinion).

Dobbs, 142 S.Ct. at 2265. Since Dobbs was decided, we have seen citizens in other states engage democratically to determine abortion policy for themselves. For instance, in August of 2022, voters in the State of Kansas rejected a constitutional amendment that would have affirmed that the State Constitution does not protect the right to an abortion.[4]

¶7 In Oklahoma, two initiative petitions seeking to include abortion rights in the Oklahoma Constitution, State Questions 825 and 828, were filed with the Oklahoma Secretary of State in September and October 2022, respectively. State Question 825 failed to receive sufficient signatures, and State Question 828 was withdrawn in December 2022. As of this writing, a joint resolution has been proposed in the Oklahoma House of Representatives calling for a referendum on the "Oklahoma Abortion Law Act of 2023."[5] See H.R.J. Res. 1012, 59th Leg., 1st Sess. (Okla. 2023).

¶8 This Court has studiously avoided addressing the question of whether the Oklahoma Constitution protects a right to abortion, despite having been presented with numerous opportunities to do so.[6] In light of the Court's track record of diligently avoiding these issues, it is difficult to understand why now the majority believes "there is a pressing need to rule on this matter as soon as possible."[7] Perhaps a better question is, if the rights implicated by our decision today warrant such urgent attention, why did the Court prevent the People from deciding on these rights thirty years ago? Now, rather than allowing the democratic process to play out in Oklahoma, the majority has imposed its own policy preferences upon the People of our State. The majority's decision to intervene now does not reconcile with our prior jurisprudence.

¶9 Moreover, to the extent the Court has weighed in now, it has only further muddied the waters as to the rights of Oklahomans and our State's abortion policy. The majority claims that it makes no ruling on whether the Oklahoma Constitution provides a right to an elective termination of pregnancy,[8] yet the majority rejects the constitutional challenge to 21 O.S. § 861, which explicitly prohibits elective abortions. In upholding our State's 113-year ban on elective abortion, the majority says, "We make no ruling on whether the Oklahoma Constitution provides a right to an elective termination of pregnancy, i.e., one made outside of preserving the life of the pregnant woman as we have defined herein."[9] I can only read this language as an attempt by the majority to leave the door open to further constitutional challenges, and certainly not to resolve this issue.

¶10 The amount of Amicus Curiae filed in this cause is varied and numerous.[10] It should not weigh lightly on our examination that most of the amicus arguments were grounded in policy. Policy making is the job of the legislature. Griffin v. Mullinix, 1997 OK 120, ¶ 18, 947 P.2d 177, 179 ("The Oklahoma Legislature, not this Court or Congress, is primarily vested with the responsibility to declare the public policy of this state."). As a Court, we are not allowed to receive comments from the public, correspond with the public, or consider the public debate on an issue. More importantly, we do not serve constituents, and we are not elected. Simply put, this Court is neither empowered nor well-situated to craft policy for our State.

¶11 Yet today, the majority has attempted to craft an abortion policy that will do little to assuage the strong and polarizing opinions so many Oklahomans passionately hold on this issue. And just as Roe never resolved this issue on the federal level, today's opinion will not resolve this issue within our state. In a Democracy, such as ours, this most divisive issue of our time can only--and should only--be resolved by the People.

¶12 Sadly, I find the majority's opinion to be a premature intervention that undermines the democratic process on this issue and will serve to undermine our credibility with the People of Oklahoma. I dissent.

FOOTNOTES

[1] Article II, § 1 of the Oklahoma Constitution provides:

All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States.

[2] See Okla. Coal. for Reprod. Just. v. Cline, 2019 OK 33, ¶ 41, 441 P.3d 1145, 1160 ("Under United States Supreme Court precedent, H.B. 2684 is unconstitutional and therefore void and of no effect."); Oklahoma Coal. for Reprod. Justice v. Cline, 2012 OK 102, ¶ 3, 292 P.3d 27, 28 ("The challenged measure is facially unconstitutional pursuant to [Planned Parenthood of Se. Pa. v.] Casey, 505 U.S. 833, 112 S.Ct. 2791."); Burns v. Cline, 2016 OK 121, ¶ 19, 387 P.3d 348, 354 ("Under the guidance of [Whole Woman's Health v. Hellerstedt, 579 U.S. 582], SB 1848 creates a constitutionally impermissible hurdle for women who seek lawful abortions."); In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, ¶ 35, 838 P.2d 1, 12 ("After Casey, it became incontrovertibly clear that the petition could not withstand a constitutional challenge.").

[3] "Initiative Petition No. 349 does not allow a woman to make a private decision to obtain an abortion at any time during the pregnancy--either before or after viability. It does not protect a woman's liberty interest as defined by Casey." In re Initiative Petition No. 349, 1992 OK 122, ¶ 11, 838 P.2d at 6 (emphasis in original).

[4] Lalee Ibssa, Kansas Voters Preserve Abortion Access in High-Turnout Primary, ABC News (Aug. 3, 2022, 9:28 AM), https://abcnews.go.com/Politics/kansas-voters-preserve-abortion-access-high-turnout-primary/story?id=87750829. In 2019, the Supreme Court of Kansas determined that the Kansas Constitution protects a right to abortion. Hodes & Nauser, MDs, P.A. v. Schmidt, 440 P.3d 461 (Kan. 2019).

[5] The substance of the "Oklahoma Abortion Law Act of 2023" is not included in the joint resolution at this time.

[6] See, e.g., Burns v. Cline, 2016 OK 121, ¶ 4, 387 P.3d 348, 351 ("Burns identified multiple Oklahoma state constitutional challenges to SB 1848 in his district court petition. Before addressing the various state constitutional arguments of Burns and defendants, we must first acknowledge that SB 1848 is fatally flawed legislation under our federal Constitution and the recent pronouncements in Hellerstedt, supra.").

[7] Majority Op., ¶ 2.

[8] Majority Op., ¶ 10.

[9] Id.

[10] Those filing briefs in support of the Petitioners included the American College of Obstetricians and Gynecologists, American Medical Association, Oklahoma State Medical Assocation, and Society for Maternal Fetal Medicine; Erika Lucas, Vest Her, and Oklahoma Businesses and Business Leaders; Rev. Barbara Prose, Rev. Dr. Diana K. Davies, Rev. T. Sheri Dickerson, Rabbi Marc Boone Fitzerman, Rabbi Vered Harris, Rabbi Abby Jacobson, Rabbi Dan Kaiman, Rev. Dr. Marlin Lavanhar, and Rev. Dr. Lori Walke.

Those filing briefs in support of the Respondents included the Elliot Institute and Oklahoma Faith Leaders; the American Center for Law & Justice and Forty-One Members of the Oklahoma Senate and House of Representatives; the Frederick Douglass Foundation and National Christian Hispanic Leadership Organization; the Prolife Center at the University of St. Thomas; Gateway Women's Resource Center, Inc.; Professor Carter Snead, the Roman Catholic Archdiocese of Oklahoma City, and Diocese of Tulsa; Oklahoma Business Leaders; and Lora Collier, MD; Alejandro De Santiago, DO; Joseph Eble, MD; George Erbacher, DO, FAOCR; Curtis E. Harris, MS, MD, JD; James J. Hutchins, MD; Jessica Keller, MD, FAACP, FCP; Abel Lau, MD; Phyllis W. Lauinger, MD; Michael A. Malloy, MD; Christy J. Mareshie, DO; Rita B. Sanders, DO; Frank Schmidt, Jr., MD; Michael Tanner, MD; Jessica Weber, DO; Leon J. Yoder, DO.

 

 

DARBY, J., dissenting:

¶1 I dissent. After arrogating the states' right to regulate abortion for forty-nine years, the United States Supreme Court returned the authority to the people of each state and their elected representatives. See Dobbs v. Jackson Women's Health Org., 213 L. Ed. 2d 545, 142 S. Ct. 2228, 2284 (2022). In response, the majority of this Court has created and defined a new Oklahoma constitutional right based on an exception in a statute. The Court invokes a strict standard of review, contrary to federal or state precedent, to find Oklahoma's statute violative of Oklahoma's Constitution. I disagree with the Court's analysis, or lack thereof. And, finally, I am perplexed by the Court's numerous declarations that it is not ruling on elective abortion, when in fact it is.

I. OKLAHOMA CONSTITUTIONAL RIGHTS REGARDING ABORTION

¶2 The Petitioners allege the two statutes in question violate inherent rights and substantive due process rights guaranteed by article II, sections 2 and 7 of the Oklahoma Constitution. Accordingly, the majority opinion proceeds to resolve the question of what right to abortion, if any, is protected under the Oklahoma Constitution.

A. Article 2, Section 7 Due Process Clause

¶3 The majority opinion purports to rely on Dobbs, by distinguishing Oklahoma law from the other statutes considered in Dobbs, in order to find that--based on the Oklahoma statutory exception allowing abortions when necessary to preserve the life of the mother--Oklahoma has a constitutional due process right to abortion if necessary to preserve the life of the mother. See Maj. Op. ¶¶ 7--8. But review of Dobbs and its attached appendices, which considers laws of the 50 states and the District of Columbia at the founding of the country or statehood, shows that at least 40 out of 50 states plus the District of Columbia had language similar to Oklahoma's which allowed limited exceptions from the state's criminal ban on abortion if necessary to preserve the life of the mother. See Dobbs, 142 S. Ct., at 2285--300. Simply put: following Dobbs does not require this Court to find a state constitutional due process right to an abortion just because there was a limited exception to its illegality at statehood. If it did, the United States Supreme Court would have found such right under the United States Constitution--or at least discussed that possibility in Dobbs. It did not.

¶4 The majority there ends its analysis and finds a due process right to an abortion in Oklahoma's Constitution. Justice Combs, in his separate writing, notes that the "Third Legislature of the State of Oklahoma was surely aware of the framers' work and did not consider such laws to be 'repugnant' to our Constitution." See Combs, J., Op. concurring specially, ¶ 3 n.2. I do not argue here that the exception to the criminality of abortion to preserve the life of the mother is unconstitutional. But just because the statutes allow an abortion in a limited circumstance and do not thereby offend our state Constitution, does not necessarily mean the exception is a constitutional right. The schedule to the Oklahoma Constitution, which provided for prior laws to remain in force did not make those laws constitutional provisions.

b. Article 2, Section 2 Inherent Rights

¶5 The majority opinion next recognizes the inherent rights to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry which are protected for any person under the Oklahoma Constitution in article II, section 2 and finds that provision also "stands as the basis for protecting a pregnant woman's right to terminate a pregnancy in order to preserve her life." Maj. Op. ¶ 8. There is no further analysis on this point before the majority "hold[s] that the Oklahoma Constitution creates an inherent right of a pregnant woman to terminate a pregnancy when necessary to preserve her life." Maj. Op. ¶ 9.

¶6 There is also no analysis on how or when article 2, section 2 may provide a right to life to the unborn child. Justice Combs notes that the state has a legitimate interest in protecting the life of a viable unborn fetus and identifies a "medical timeline of urgency" where a physician must at some point "also protect the life of the viable fetus in addition to the life of the mother." See Combs, J., Op. concurring specially, ¶ 7. But the majority does not discuss any rights as they may apply to the unborn child.

¶7 The majority opinion immediately goes on to judicially define the new constitutional right to terminate a pregnancy when necessary to preserve the life of the mother.

[A] woman has an inherent right to choose to terminate her pregnancy if at any point in the pregnancy, the woman's physician has determined to a reasonable degree of medical certainty or probability that the continuation of the pregnancy will endanger the woman's life due to the pregnancy itself or due to a medical condition that the woman is either currently suffering from or likely to suffer from during the pregnancy. Absolute certainty is not required, however, mere possibility or speculation is insufficient.

Maj. Op. ¶ 9. The majority creates this expansive constitutional right without any provided authority or analysis. That is not our role.

II. APPLIED STANDARD OF REVIEW

¶8 The majority then incorrectly states the standard of review. Prior to Dobbs, the United States Supreme Court applied two standards of review to challenges to regulations on abortion. Prior to the fetus's viability, the U.S. Supreme Court would apply the "undue burden" standard. Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 878, 112 S. Ct. 2791, 2821, 120 L. Ed. 2d 674 (1992), overruled by Dobbs, 142 S. Ct. 2228.[1] After viability, the U.S. Supreme Court reviewed regulations on abortion for rational basis. Casey, 505 U.S., at 879.[2] Dobbs changed that and clearly stated that the federal standard governing all challenges to state abortion regulations under the United States Constitution is now rational basis. Dobbs, 142 L.Ed, at 2283. 2283.[3] The United States Supreme Court has clearly found that the United States Constitution "does not prohibit the citizens of each State from regulating or prohibiting abortion." Id., at 2284. Thus post Dobbs, we now follow state law regarding the correct standard of review to apply to challenges to abortion regulations pursuant to the Oklahoma Constitution.

¶9 Generally, this Court follows well established principles in considering a statute's constitutionality. See In re Assessments for Year 2005 of Certain Real Prop. Owned by Askins Properties, L.L.C., 2007 OK 25, ¶ 12, 161 P.3d 303, 310 (quoting Fent v. Okla. Capitol Improvement Auth., 1999 OK 64, 984 P.2d 200). Every presumption must be indulged in favor of finding a statute constitutional. Ibid. If two interpretations are possible, this Court is bound to give the interpretation that renders it constitutional. Ibid. 

¶10 Regarding article 2, section 2 of the Constitution specifically, this Court has stated that courts may not annul a statute "as being in violation of substantive due process unless it is clearly irrelevant to the policy the Legislature may adopt or is arbitrary, unreasonable or discriminatory." Edmondson v. Pearce, 2004 OK 23, ¶ 35, 91 P.3d 605, 624, as corrected (July 28, 2004) (quoting Jack Lincoln Shops, Inc. v. State Dry Cleaners' Bd., 1943 OK 28, 135 P.2d 332,333; see also Fair Sch. Fin. Council of Okla., Inc. v. State, 1987 OK 114, ¶ 62, 746 P.2d 1135, 1150 (stating that we review the constitutionality of a statute to determine if the Legislature acted within its power, and "the act will be declared constitutional unless it can be clearly demonstrated that the Legislature acted arbitrarily and capriciously."). But instead of following this Court's standard, which would require the Court to uphold the statute unless it is arbitrary, unreasonable, or discriminatory, the majority chooses to apply a much stricter standard.

¶11 The majority does not simply adopt the higher standard the United States Supreme Court previously applied to abortion--the Court goes a step further and applies strict scrutiny to the statute. The majority cites to a bar discipline case wherein we applied strict scrutiny to a regulation that limited an attorney's federal first amendment right to speech. See Maj. Op. ¶ 11; see also State ex rel. Okla. Bar Ass'n v. Porter, 1988 OK 114, ¶¶ 19, 24, 766 P.2d 958, 966-68.[4] Yet the majority offers no explanation for the application of a higher standard of review than previously applied under federal law or Oklahoma law.

¶12 This is not the first time this Court has been asked to address the constitutionality of a statute under article 2, section 2 of the Oklahoma Constitution. In Edmondson v. Pearce, we said: "The inherent right to 'life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own labor' guaranteed to the people by Sec. 2, Art. 2, of the state constitution, is subject to reasonable regulation in the exercise of the police power." 2004 OK 23, ¶ 35, 91 P.3d, at 624 (quoting Jack Lincoln Shops, Inc. v. State Dry Cleaners' Bd., 1943 OK 28, 135 P.2d 332, 333, Second Syllabus). We noted that "the rights guaranteed in OKLA.CONST. art. 2, § 2 are qualified. They are not absolute." Edmondson, 2004 OK 23, ¶ 34, 91 P.3d, at 624. We further explained that it "is well settled that the legislature may, in the proper exercise of the police power, define and declare what is to be deemed injurious to public health, morals, safety and general welfare. And, the legislature is primarily the judge of whether certain facts or conditions justify regulation of a particular business for the public welfare." Edmondson, 2004 OK 23, ¶ 34, 91 P.3d, at 623 (quoting One Chicago Coin's Play Boy Marble Bd. v. State, 1949 OK 251, ¶ 11, 212 P.2d 129, 132). We have repeatedly stated that:

In the legislative department of the government is vested the power of enacting all laws. To that department is intrusted the determination of what laws shall be enacted, and what laws shall not be enacted. It must in the first instance determine whether a proposed measure is valid or invalid, and in doing so it will not be presumed that the members of that department, whether they be the electors at the polls, or the members of the Legislature, will enact or attempt to enact legislative measures that they know are violative of the state Constitution or of the federal Constitution, but that they will act from patriotic motives and endeavor to adopt such laws only as will best serve the public good, keeping in mind the limitation upon their powers fixed by the Constitution of the state and the federal Constitution as the supreme law of the land. When such department has acted upon a proposed measure and adopted same, it thereby becomes clothed with the presumption that it is a valid enactment and with its validity the executive and judicial departments have nothing to do, until it becomes the duty of these respective departments to participate in the construction or enforcement of such statute. The duty of determining what law shall be enacted and what law shall not be enacted rests neither upon the executive nor the judicial department.

State ex rel. York v. Turpen, 1984 OK 26, 681 P.2d 763, 766 (quoting Threadgill v. Cross, 1910 OK 165, ¶ 19, 109 P. 558, 562).

III. ANALYSIS OF THE STATUTES

¶13 The majority applies strict scrutiny and finds no compelling interest, but fails to discuss any interest of the State. To be clear, the State's interest is in protecting the life of the unborn child.

¶14 The definition of when an exception is allowed is a policy choice for the people of the state of Oklahoma, not a decision we should be dictating from above. "The duty of determining what law shall be enacted and what law shall not be enacted rests neither upon the executive nor the judicial department." Threadgill, 1910 OK 165, ¶ 19, 109 P. 558, 562. The people of Oklahoma have the option to change this legislative language, and perhaps should do so, in order to help provide further guidance and clarity to medical professionals for when medical emergency abortions are allowed--but that is not the role of this Court.

III. ELECTIVE ABORTION IN OKLAHOMA

¶15 Finally, the opinion notes in multiple places that the Court "makes no ruling on whether the Oklahoma Constitution provides a right to an elective termination of a pregnancy. See Maj. Op. ¶¶ 10, 13. Yet, following Dobbs, it is clear that Oklahoma has not historically recognized a right to an elective abortion. See 21 O.S.2011, § 861. Further, it is inexplicable to me how the majority finds section 861 constitutional because "it allows for a termination of a pregnancy in order to preserve the life of the pregnant woman," but somehow asserts that it does not make a "ruling on whether an elective abortion is constitutional" when elective abortions are prohibited under the same section. See Maj. Op. ¶ 13.

¶16 I cannot join in the majority opinion because I do not believe the statute is unconstitutional under the rational basis test. Our decision is whether both statutes are constitutional as written--and they are. For the above reasons, I dissent.

FOOTNOTES

[1] "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 878, 112 S. Ct. 2791, 2821, 120 L. Ed. 2d 674 (1992), overruled by Dobbs v. Jackson Women's Health Org., 213 L. Ed. 2d 545, 142 S. Ct. 2228 (2022).

[2] "[S]ubsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Casey, 505 U.S., at 879, overruled by Dobbs, 142 S. Ct. 2228.

[3] "Under our precedents, rational-basis review is the appropriate standard for such challenges. As we have explained, procuring an abortion is not a fundamental constitutional right because such a right has no basis in the Constitution's text or in our Nation's history." Dobbs, 142 S. Ct., at 2283.

[4] "[T]he First Amendment is clearly offended by such a restriction on the free exchange of information pertinent to the functioning of government embodied by this prohibition of attorney criticism. Thus, utilization of disciplinary rules to sanction the speech here in question is a significant impairment of First Amendment rights. Where, as here, a prohibition is directed at speech itself, and the speech is ultimately related to the process of self government, the state may prevail only upon showing a subordinating interest which is compelling." State ex rel. Okla. Bar Ass'n v. Porter, 1988 OK 114, ¶ 24, 766 P.2d 958, 967.

 

 

KUEHN, J., with whom ROWE, V.C.J., joins, DISSENTING:

¶1 Petitioners claim the Oklahoma Constitution protects a woman's right to terminate her pregnancy. Petitioners, Respondents, and this Court all agree that the plain language of our Constitution does not. The question is why this Court chooses to find that protection is implied by some other existing language. Instead of creating language, the Court should use the most powerful tool in the judicial toolbox, judicial restraint. We are asked to decide whether this protection currently exists in the language of the Oklahoma Constitution, yes or no. With that determination our judicial role ends, and judicial restraint should begin.

¶2 It is not the job of this Court to create a right where none exists. Nor is it the Court's job to make policy decisions. The Legislature, through legislation, and the People, through their elected representatives and through referendum, have that responsibility. This is not a novel concept in Oklahoma jurisprudence. And the United States Supreme Court clearly recognized that whether a state protects the right to terminate a pregnancy should be decided by the people of that State.[1] Ultimately, the people of Oklahoma are the ones to decide this issue. This Court can only determine what law currently exists.

¶3 The Majority first looks at Article II, section 7 of our Constitution, which provides, "No person shall be deprived of life, liberty, or property, without due process of law." Recently the United States Supreme Court determined that this language in the federal Constitution does not include a woman's right to terminate her pregnancy. Dobbs v. Jackson Women's Health Org., 142 S.Ct. 2228, 2284 (2022). Previously, of course, the Court had found the same language did protect that right. Thus, the Court needed to explain its reasoning. It concluded that, in order to find a fundamental right within the liberty interest of the Due Process Clause -- a right which is not included in the specific text -- one must determine whether the right is deeply rooted in our Nation's history and tradition. Id. at 2246. The Court then explored the general history of termination of pregnancy at common law and in state and federal statutes, and determined that the right to terminate a pregnancy was not deeply rooted in colonial times or, after its founding, the United States. Id. at 2253-54.

¶4 The Majority uses this same analysis to find that the Oklahoma Constitution provides a limited protection for termination of a pregnancy to preserve a woman's life. I believe this is misguided. We need not engage in this analysis to decide the question before us. The Dobbs Court directed, "[t]he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. Roe and Casey arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives." Id. at 2284.

¶5 To interpret the Oklahoma Constitution, we need not use a federal analysis or test. That is, we begin our analysis with a clean slate. We begin with looking at the language of the Constitution itself. Only if it is ambiguous do we look elsewhere. I agree with the Majority that since before statehood Oklahoma has, by statute, exempted from criminal prosecution a termination of pregnancy which is necessary to preserve the mother's life. This humane exception has consistently been included in most Oklahoma statutes regulating abortion, from the territorial code through the most recent legislative session. But the framers of the Oklahoma Constitution did not include it. And the Legislature and people of Oklahoma have had over a century to preserve this exception as a Constitutional right. They have not done so. There simply is no language in our due process clause which includes any right to terminate a pregnancy.

¶6 The Majority also suggests that Article II, section 2 of the Oklahoma Constitution may preserve a right to abort. That provision begins, "All persons have the inherent right to life...." The Majority first says this clause "can be viewed as" protecting a termination of pregnancy to preserve a woman's life. And, immediately thereafter, the Majority holds that the Oklahoma Constitution "creates an inherent right of a pregnant woman to terminate a pregnancy when necessary to preserve her life." But the Majority provides no legal explanation for this statement. Is it based on the statutory analysis justifying the inclusion of this right under the due process clause? Or is the Majority suggesting that, because we all have a right to life, anything which threatens that right may give rise to a constitutional protection or, conversely, prohibition? And, under some rare and terrible circumstances, people's rights to life may conflict. How do we balance that? I believe the general language in Article II, section 2 is not enough, and certainly not without more explanation, to bear the weight of this specific constitutional protection.

¶7 Because the Oklahoma Constitution does not explicitly protect termination of pregnancy, the Legislature has the authority to regulate it, to ban it, and to criminalize its procurement. And the Legislature has done so, almost since statehood. I would find that 21 O.S.2021, § 861 was constitutional, but was superseded by 63 O.S. 2022, § 1-731.4; I would also find Section 1-731.4 constitutional. The Legislature -- not this Court -- can also enact exceptions to that ban. Section 861 includes such an exception, to preserve the life of the mother. In 2022 the Legislature enacted Section 1-731.4, which prohibits termination of pregnancy except to save the life of a woman "in a medical emergency." And, as a matter of policy, the Legislature defined what that means. Even if I agreed with the Majority that the Oklahoma Constitution provides a limited right to termination of pregnancy to preserve the life of the mother, I could not agree with the Majority's attempt to define that phrase. Again, that task belongs to either the people or their legislative representatives.

¶8 All who practice medicine face difficult, important, life decisions for their patients every day. When a mother must make the horrific decision to choose between her own life and that of her child, her medical team is present to provide her medical expertise. Each situation will be different, and this Court is in no better position to define what constitutes an "emergency" than the people (through their elected representatives) are. The exception is limited to emergencies, because under current Oklahoma law, abortion is illegal except in an emergency. This exception protects what is perhaps the most difficult choice a mother will ever have to make.

¶9 The Oklahoma Constitution does not include a right to abortion. The people, or their elected representatives, may include this limited protection in the Constitution. I do not believe it is this Court's place to do so, absent some ambiguity in the current language that simply isn't there.

FOOTNOTES

[1] Dobbs v. Jackson Women's Health Org., 142 S.Ct. 2228, 2243, 2247, 2257, 2259, 2265, 2277, 2279, 2284 (2022).

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Attorney General's Opinions

 
Cite
Name
Level

 
2023 OK AG 9, 
Question Submitted by: The Honorable Mark McBride, Oklahoma House of Representatives, District 53
Discussed

 
2023 OK AG 12, 
Question Submitted by: The Honorable Warren Hamilton, Oklahoma State Senate, District 7, et al.
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
2023 OK 60, 531 P.3d 117, 
OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE v. STATE OF OKLAHOMA
Discussed at Length

 
2023 OK 111, 
OKLAHOMA CALL FOR REPRODUCTIVE JUSTICE v. DRUMMOND
Discussed at Length

 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases

 
Cite
Name
Level

 
1994 OK CR 3, 868 P.2d 730, 
HUGHES v. STATE
Discussed

 
1940 OK CR 5, 98 P.2d 625, 68 Okl.Cr. 303, 
Lynch v State
Discussed

 
1949 OK CR 11, 202 P.2d 433, 88 Okl.Cr. 270, 
Ex parte Burns
Discussed

 
1973 OK CR 51, 509 P.2d 481, 
JOBE v. STATE
Discussed at Length

 
1953 OK CR 106, 260 P.2d 422, 97 Okl.Cr. 136, 
HARMON v. STATE
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1987 OK 76, 743 P.2d 1041, 58 OBJ 2310, 
A.E. v. State
Discussed

 
1987 OK 114, 746 P.2d 1135, 58 OBJ 3282, 
Fair School Finance Council of Oklahoma, Inc. v. State
Discussed

 
1988 OK 89, 761 P.2d 472, 59 OBJ 1978, 
Short v. Kiamichi Area Vo-Tech School
Discussed

 
1988 OK 114, 766 P.2d 958, 
State ex rel. Oklahoma Bar Ass'n v. Porter
Discussed at Length

 
1990 OK 89, 801 P.2d 703, 61 OBJ 2374, 
D.D.F., Matter of
Discussed

 
1992 OK 122, 838 P.2d 1, 63 OBJ 2386, 
Initiative Petition No. 349, State Question No. 642, In re
Discussed at Length

 
1918 OK 38, 170 P. 476, 69 Okla. 92, 
OELERKING v. HIATT
Discussed

 
1933 OK 473, 25 P.2d 54, 165 Okla. 80, 
Ex parte MEEK.
Discussed

 
1910 OK 165, 109 P. 558, 26 Okla. 403, 
THREADGILL v. CROSS
Discussed at Length

 
2004 OK 23, 91 P.3d 605, 
EDMONDSON v. PEARCE
Discussed at Length

 
1930 OK 455, 292 P. 365, 145 Okla. 202, 
LOONEY v. LEEPER
Discussed

 
2007 OK 25, 161 P.3d 303, 
IN THE MATTER OF THE ASSESSMENTS FOR THE YEAR 2005 OF CERTAIN REAL PROPERTY
Discussed

 
2012 OK 102, 292 P.3d 27, 
OKLAHOMA COALITION FOR REPRODUCTIVE JUSTICE v. CLINE
Discussed

 
1976 OK 97, 552 P.2d 705, 
SESOW v. SWEARINGEN
Discussed

 
1980 OK 36, 608 P.2d 1139, 
City of Sand Springs v. Department of Public Welfare
Discussed

 
1977 OK 98, 565 P.2d 15, 
UMHOLTZ v. CITY OF TULSA
Discussed

 
2016 OK 121, 387 P.3d 348, 
BURNS v. CLINE
Discussed at Length

 
2017 OK 100, 408 P.3d 599, 
HUNSUCKER v. FALLIN
Discussed

 
2019 OK 33, 441 P.3d 1145, 
OKLAHOMA COALITION FOR REPRODUCTIVE JUSTICE v. CLINE
Discussed at Length

 
2020 OK 57, 468 P.3d 383, 
IN RE: STATE QUESTION No. 807, INITIATIVE PETITION No. 423
Discussed

 
1997 OK 120, 947 P.2d 177, 68 OBJ 3102, 
GRIFFIN v. MULLINIX
Discussed

 
1951 OK 288, 237 P.2d 624, 205 Okla. 364, 
In re HOUSE BILL NO. 145
Discussed at Length

 
1949 OK 86, 205 P.2d 1162, 201 Okla. 344, 
CONSUMERS COOP. ASS'N v. TITUS
Discussed

 
1949 OK 251, 212 P.2d 129, 202 Okla. 246, 
ONE CHICAGO COIN'S PLAY BOY MARBLE BD. v. STATE ex rel. ADAMS
Discussed

 
1999 OK 64, 984 P.2d 200, 70 OBJ 2100, 
Fent v. Oklahoma Capitol Improvement Authority
Discussed

 
1943 OK 28, 135 P.2d 332, 192 Okla. 251, 
JACK LINCOLN SHOPS v. STATE DRY CLEANERS' BD.
Discussed at Length

 
1912 OK 425, 124 P. 1092, 33 Okla. 141, 
STATE ex rel. IKARD v. RUSSELL
Discussed at Length

 
1912 OK 663, 127 P. 698, 33 Okla. 708, 
GILLILAND v. WHITTLE
Discussed

 
1984 OK 26, 681 P.2d 763, 55 OBJ 1013, 
State ex rel. York v. Turpen
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 2025, 
Substitution of Parties
Cited

Title 21. Crimes and Punishments

 
Cite
Name
Level

 
21 O.S. 1, 
Short Title
Cited

 
21 O.S. 861, 
Procuring an Abortion
Discussed at Length

 
21 O.S. 1111, 
Rape Defined
Discussed

Title 22. Criminal Procedure

 
Cite
Name
Level

 
22 O.S. 311, 
Definition of Grand Jury
Discussed

Title 25. Definitions and General Provisions

 
Cite
Name
Level

 
25 O.S. 24, 
Gender Meaning
Cited

Title 32. Husband and Wife

 
Cite
Name
Level

 
32 O.S. 2, 
Repealed
Cited

 
32 O.S. 15, 
Renumbered as 43 O.S. § 214 by Laws 1989, SB 121, c. 333, § 2, eff. November 1, 1989
Cited

Title 38. Jurors

 
Cite
Name
Level

 
38 O.S. 28, 
Qualifications and Exemptions
Cited

Title 63. Public Health and Safety

 
Cite
Name
Level

 
63 O.S. 1-731.4, 
Medical Emergency - Grounds to Abort - Penalties
Discussed at Length

 
63 O.S. 1-731, 
Persons Who May Perform Abortions - Violations - Penalties
Cited

Title 76. Torts

 
Cite
Name
Level

 
76 O.S. 8, 
Wrongs against Personal Relations
Discussed

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA